UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MICHAEL McCLANAHAN, et al.

v.                                    No. 17-cv-01720-JWD-RLB

SCOTT WILSON, et al.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
SUBMITTED BY DEFENDANT, SCOTT WILSON, IN HIS OFFICIAL
CAPACITY AS MAYOR PRO TEMPORE OF CITY OF BATON ROUGE/
PARISH OF EAST BATON ROUGE**

**I.      Findings of Fact**

1.      The First Amended Complaint (Doc 2) was filed on December 12, 2017 by three plaintiffs, Michael McClanahan, Eugene Collins and Gary Chambers.

2.      Named as defendants were "Defendant Scott Wilson (in his official capacity) and the City of Baton Rouge (collectively Defendants)".  (Doc 2, ¶ 1)

3.      In describing Scott Wilson's official capacity in ¶ 19 of Doc 2, Councilman Wilson is described as Mayor Pro Tempore of the Metro Council.

4.      Paragraph 20 of Doc 2 describes Defendant City of Baton Rouge as a political subdivision of the State of Louisiana with the city's governing authority consolidated with the government of East Baton Rouge Parish ("City Parish").

5.      The case is an action brought under 42 U.S.C. § 1983 seeking declaratory relief against both Defendants declaring that the "removal" of plaintiffs from making public comments at a Metro Council meeting on May 10, 2017 was a constitutional violation.  Plaintiffs also seek an award of costs and attorney fees. (Doc 2, Prayer For Relief)

-1-

## DEFENDANT'S MOTION TO DISMISS

6.      On August 5, 2020, plaintiffs filed *Motion For Partial Dismissal *_With Prejudice_ (Doc 104). In the motion, plaintiffs represent that they have decided to dismiss their claims against the Defendant, City of Baton Rouge/Parish of East Baton Rouge ("City Parish"), with prejudice.  The motion further represents that "Plaintiffs will reserve any and all rights they have against Defendant, Scott Wilson."  (Doc 104, ¶ 1)

7.      By Order (Doc 105) signed August 6, 2020, this Court granted the requested relief.  The pertinent part of the Court's Order (Doc 105) reads:

> IT IS ORDERED, ADJUDGED AND DECREED that all claims of the Plaintiffs, Michael McClanahan, Gary Chambers, and Eugene Collins against the Defendant, City of Baton Rouge/Parish of East Baton Rouge be are hereby dismissed, with prejudice. (Emphasis added)

8.      A suit against a government official in his official capacity is the equivalent of filing suit against the government entity of which the officer is the agent.  *Monell v. New York City Dept. Of Social Serv. of City of New York,* 436 U.S. 691, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 661 (1998).  In *Lebebure v. Bocker*, 390 F.Supp.3d 729, 753-754, Judge Dick of this Court found, "Accordingly, the claims against the DA in his official capacity are, in effect, claims against the municipal entity he represents which is the West Feliciana Parish District Attorney's office."

9.      In *Kentucky v. Graham,* 105 S.Ct. 3099, 3105 (1985), the United States Supreme Court defined the differences between personal and official capacity actions:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  See, *e.g., Scheuer v. Rhodes*, 416 U.S. 232, 237-238, 94 S.Ct. 1683, 1686-1687, 40 L.Ed.2d 90 (1974).  Official-capacity suit, in contrast, "generally represent only another way of pleading an action against

an entity of which an officer is an agent."  *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 (1978).  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  *Brandon, supra*, 469 U.S., at 471-472, 105 S.Ct. at 878.  It is not a suit against the official personally, for the real party in interest is the entity.

10.    When a plaintiff asserts claims against both a municipal entity and a municipal officer in his or her official capacity, the Fifth Circuit has held that the official capacity claim is "redundant" to the municipal entity claim.  See *Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010) noting that plaintiff's § 1983 claims against a governmental entity "render[ed] any official capacity claim against an employee of that entity redundant".

11.    Courts throughout the country have in many instances dismissed the official capacity claim and allowed the case to proceed to trial against the legal entity usually because the legal entity who is responsible for the official actions remains a defendant.  It is the <u>dismissal with prejudice</u> of the legal entity itself that occasions this motion to dismiss and is fatal to plaintiffs' case.

12.    The Fifth Circuit has held that a <u>dismissal with prejudice</u> is a final judgment on the merits. *Brooks v. Raymond Dugat Co. L.C.,* 336 F.3d 360, 362 (5th Cir. 2003).  See *Schwartz v. Folloder*, 767 F.2d 125, 130 (5th Cir. 1985), "Dismissal of an action with prejudice is a complete adjudication of the issues presented by the pleadings and is a bar to further action between the parties.  An adjudication in favor of the defendants, by court or jury, can rise no higher than this."  And "[A] dismissal with prejudice that has the effect of a final adjudication on the merits favorable to the defendant."  (Citations omitted.)

13.    The dismissal with prejudice of all claims of the plaintiffs against the City of Baton

Rouge/Parish of East Baton Rouge, the municipal entity of which Scott Wilson is an official, is a complete adjudication of the claim against the municipal entity and the redundant claim against Scott Wilson in his official capacity.

14.     There being a complete adjudication on the one and similar claim, whether made against the municipal entity or the official capacity officer of the municipal entity, nothing remains for trial by this Court.

15.     The case law simply holds that you do not have to sue both, that suit against one is suit against the other, as they are considered the same entity.  And because they are the same entity, it follows that a dismissal with prejudice (deemed an adjudication on the merits or final judgment against one) is a dismissal with prejudice of the other.

16.     Despite plaintiffs' attempt to reserve their claims against Scott Wilson, there is no such claim to reserve.  The only claims made against Scott Wilson were made against Scott Wilson "in his official capacity".  As such, these official capacity claims are the same as the claims made against the entity, City of Baton Rouge/Parish of East Baton Rouge, nothing more than a mere redundancy.

17.     And the claims against the City of Baton Rouge/Parish of East Baton Rouge having been dismissed with prejudice, a final judgment has been rendered both as to Scott Wilson, in his official capacity as Mayor Pro Tempore of the City of Baton Rouge/Parish of East Baton Rouge, and the City of Baton Rouge, Parish of East Baton Rouge; and no claim remains to be reserved.

18.     The dismissal with prejudice of plaintiffs' claims against City of Baton Rouge/Parish of East Baton Rouge was based on the plaintiffs' voluntary decision to fail to prosecute those claims.  Since the claims against the City of Baton Rouge/Parish of East Baton Rouge, are claims that the plaintiffs failed to prosecute and dismissed with prejudice, the claims against Scott Wilson in his official

capacity are subject to being dismissed with prejudice as well, based on that same failure to prosecute under FRCP 41(b).

19.     "A claim becomes moot 'when the issues presented are no longer 'live' or the parties legally lack a legally cognizable interest in the outcome.'" *Smith v. Winter,* 782 F.2d 508, 510 (5th Cir. 1986), citing *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491, 502 (1969).

20.     The claim against Wilson in his official capacity became moot, became deprived of a case or controversy and then lacked subject matter jurisdiction once the exact same claim, the redundant claim against the municipal entity was dismissed with prejudice.

21.     This Court lacks subject matter jurisdiction.  No claims remain to be litigated; no entity remains to satisfy any judgment rendered; and all claims against Scott Wilson, in his official capacity, should be dismissed with prejudice.

**FACTS**

22.     On May 3, 2017, the U.S. Department of Justice announced that it was closing its investigation into the killing of Alton Sterling by officers of the Baton Rouge Police Department. (Established Fact No. 1 in Pretrial Order.)

23.     In response to that decision, it was the view of Plaintiffs that the government of the City of Baton Rouge/ East Baton Rouge Parish "should not return to business-as-usual without first resolving how to respond to the killing." (Established Fact No. 2 in Pretrial Order.)

24.     The Baton Rouge Metro Council held a meeting on May 10, 2017. (Established Fact No. 3 in Pretrial Order.)

**Eugene Collins**

25.    Eugene Collins attended the May 10, 2017, meeting of the Metropolitan Council.  (D. Ex. 45, p. 10)

26.    Eugene Collins was aware that Alton Sterling had been killed on July 5, 2016.  (D. Ex. 45, p. 14)

27.    Eugene Collins was aware that the Department of Justice announced it was closing the investigation into the death of Alton Sterling on May 3, 2017.  (D. Ex. 45, p. 17)

28.    Eugene Collins was aware that the next meeting of the Metropolitan Council after the May 3, 2017 announced was on May 10, 2017.  (D. Ex. 45, p. 17)

29.    When his deposition was taken on January 14, 2019, Eugene Collins was unable to recall what he said before he was ordered removed from Council Chambers on May 10, 2017. (D. Ex. 45, p. 24)

30.    In both the Complaint (Doc 1) filed December 4, 2017, and the First Amended Complaint filed December 12, 2017, Eugene Collins admitted that he said at least "I oppose this motion because on July...".  (See para. 39 of Doc 1 and 2).

31.    Eugene Collins admits that the first part of the video of his public comments on May 10, 2017 is muffled.  (D. Ex. 45, p. 28)

32.    Eugene Collins has a Facebook profile where he uses the names Eugene Weatherspoon Collins.  (D. Ex. 45, p. 28); and admits that he is the only one who posts on the profile (D. Ex. 45, p. 29); and that any post of that profile was written by him.  (D. Ex. 45, p. 29-30)

33.    On May 10, 2017, Eugene Collins shared a link on his Facebook page of an article from the Business Report.com, which is titled "Gary Chambers calls for shutdown of today's Metro Council meeting - Baton Rouge Business Report."  (D. Ex. 45, p. 33.  See also Ex. 3 attached to D. Ex. 45

as well as D. Ex. 33)

34.     At his deposition on January 14, 2019, Mr. Collins was unable to recall what he talked about on May 9 or May 10, 2017. (D. Ex. 45, pp. 56-57)

### Michael McClanahan

35.     Michael McClanahan has a law degree and is self-employed, and currently serves as the Louisiana State President of the NAACP.  (D. Ex. 43, p. 8)

36.     On May 10, 2017, Mike McClanahan served as the Baton Rouge Branch President of the NAACP. (D Ex. 43, p. 3)

37.     Michael McClanahan was aware that the May 10, 2017 meeting of the Metropolitan Council was a regularly scheduled meeting for transacting normal city business.  He attended the meeting to make sure that people's voices were heard at the council meeting.  (D. Ex. 43, pp. 9-10)

38.     Michael McClanahan represented the NAACP on May 10, 2017, and he said that the NAACP represents the people; and said he went to the May 10, 2017 meeting to voice the  people's concerns at the meeting.  (D. Ex. 43, p. 10)

39.     Michael McClanahan said there was "no question" that there other people there at the May 10, 2017 voicing a similar concern.  (D. Ex. 43, p. 10)

40     Michael McClanahan said that the specific concern at the May 10th meeting was that the city was continuing to do business as usual in spite of not coming to a conclusion on Alton Sterling's matter.  (D. Ex. 43, p. 11)

41.     In determining "business as usual", Michael McClanahan explained that the city meets and has an agenda with new business, and old business; and that the city was not fully complete with old business before they continued to move on to any new business.  (D. Ex. 43, p. 11)

42.    Michael McClanahan testified that "we was there to make sure that they finished old business completely before you bring any other thing, businesses to the forefront."  (D. Ex. 43, p. 11)

43.    When asked what "old business" he was referring to, Michael McClanahan said, "Well, the Alton Sterling matter was still lingering"; and that it had caused great concern in this city. (D. Ex. 43, p. 11)

44.    Michael McClanahan stated: "And this shooting, death, and the murder of Alton Sterling gravely affected this town.  And so for the city to say we are going to move on and sweep what happened to Alton Sterling under the rug is doing the people of this city a disservice.  And we wanted to make sure that that didn't happen."  (D. Ex. 43, p. 12)

45.    Michael McClanahan intended to get the Metro Council on May 10, 2017 to address what he refers to as "old business" by: "Okay, well, you know, there's what you call public hearing, public.  And so what – what I was going to do is do what I always do.  Approach the mike when the time permitted and talk about the Alton Sterling matter that should have been addressed way prior to that particular meeting.  That's what I did."  (D. Ex. 43, p. 12)

46.    After the Department of Justice's announcement as to its decision in the investigation of Alton Sterling on May 3, 2017, efforts were made by Michael McClanahan to raise the issue in the Metro Council by "talking with the members individually as we saw them to see how we can get this matter put on the council's agenda so that we get it taken care of.  And none of that worked.  (D. Ex. 43, pp. 14-15)

47.    Michael McClanahan has attended "thousands" or "hundreds for sure" of Metro Council meetings and he is very familiar with Council procedures.  (E. Ex. 43, p. 15)

48.    With respect to May 10, 2017, Michael McClanahan said he did not know if there was a

concerted effort to shut - - to shut the council down.  "All I know is that we were given an opportunity to speak on an issue that was unresolved, and we spoke.  And they give us three or four minutes to speak our peace and go on about our business."  (D. Ex. 43, p. 17)

49.    As representative of the Baton Rouge Chapter of the NAACP, Michael McClanahan identified the Facebook page of the organization and a post made by the organization dated May 10, 2017 from NAACP Baton Rouge Branch, Michael McClanahan, President of the Baton Rouge Chapter, which reads:

> "We need all NAACP members to wear black and pack the courthouse today at 2:00 p.m.  Tell your family and friends to come out in solidarity to demand the Mayor fire the Police Chief and two officers for the murder of Alton Sterling.  In the absence of justice, there should be no peace!"

(D. Ex. 43, pp 17-21, and D. Ex. 25)

50.    Michael McClanahan admitted that his comments made on May 10, 2017, on Item 50 has nothing to do with Item 50.  (See D. Ex. 43, pp 28-31, particularly p. 30, lines 21 through p. 31, line 6.)

**Gary Chambers**

51.    Gary Chambers was the publisher of the Rouge Collection on May 10, 2017.  (D. Ex. 44, p. 9)

52.    Gary Chambers admits that he called for the May 10, 2017 Metropolitan Council meeting to be "shut down" between May 3, 2017 and May 10, 2017.  (D. Ex. 44, p. 22)

53.    Gary Chambers disclosed that intent with "everyone" on social media, including Facebook, Instagram, and maybe the Rouge Collection.  (D. Ex. 44, pp. 22-23)

54.    Gary Chambers said the May 10, 2017 effort to shut down the Metro Council meeting was

to make sure that Alton Sterling's situation was addressed by the Metro Council.  (D. Ex. 44, p. 24)

55.    Gary Chambers posted a Facebook post on May 10, 2017, containing a posting to "shut" "Metro Council @ City Hall" and stating "The groups will meet and plan to prevent business from moving forward at the Metro Council."  See D. Ex. 44, p. 26 et seq., Deposition Exhibit 7 and Δ Ex. 39)

56.    Gary Chambers posted a video on May 9, 2017 at 11:02 p.m. discussing among other things a planned protest or sit in for the Metro Council meeting on May 10, 2017, calling for the termination of police officers and to do something about in the matter of Alton Sterling rather than "continue to punt the ball."  See Depo. Ex. 8.  See D. Ex. 44, pp. 30-34 and following.

57    Gary Chambers was aware that none of these items (termination of police officers and to do something about in the matter of Alton Sterling) were on the Metro Council agenda for May 10, 20217.  (D. Ex. 44, p. 35)

58.    The blackened area on Dep. Ex. 7, also D. Ex. 39, was distributed in the community in the form of a flyer.  (See D. Ex. 44, pp. 37-38)

59.    The hashtags on the flyer: #YOUREFIRED, #FIRESALAMONI, #FIRE LAKE, represented an effort to request that these officers be terminated.  (See D. Ex. 44, p. 41)

60.    "ShutItDown" was meant to ensure that the Metro Council deal with the matter of Alton Sterling.  (D. Ex. 44, p. 41)

61.    Gary Chambers did not believe that the City of Baton Rouge should have continued to conduct normal business while a citizen was killed by a taxpayer-paid officer.  (D. Ex. 44, p. 43)

62.    Gary Chambers said that on May 10, 2017, he went to the Metro Council with the intent to speak before the council about Alton Sterling's murder.  (D. Ex. 44, p. 46)

63.     Gary Chambers' purpose on May 10, 2017 was "to speak on Alton Sterling because he was not being addressed by the Metro Council." (D. Ex. 44, p. 49)

64.     Gary Chambers said the group effort on May 10, 2017 was "to walk to a microphone and speak for three minutes." (D. Ex. 44, p. 49)

65.     Gary Chambers "intended to speak on every single item on the agenda; and his comments were going to be to oppose "this item," because Alton Sterling was not dealt with by the Metro Council. (D. Ex. 44, p. 50)

66.     Chambers' intended to use his three minutes on every item to oppose the Metro Council going forward. (D. Ex. 44, p. 50)

67.     Chambers, in his deposition, on January 14, 2019, could not say what item he spoke on on May 10, 2017 because, as he said, he intended to speak on every item on the agenda. (D. Ex. 44, pp 52 and 62.)

68.     The content of the item on the agenda on May 10, 2017 did not matter to Gary Chambers. He felt the City of Baton Rouge should have addressed Alton Sterling and that they were not doing so, so he intended to oppose every item on the May 10, 2017 agenda. (D. Ex. 44, p. 59)

69.     Gary Chambers posted a second video on Facebook on May 10, 2017, similar to the May 9, 2017 video. See D. Ex. 44, p. 75; and Depo. Ex. 1, and D. Ex. 16 and 17)

### May 10, 2017 Meeting of Metropolitan Council

70.     Scott Wilson presided over and ran the May 10, 2017 meeting. (Established Fact No. 4 in Pretrial Order.)

71.     Scott Wilson, as Mayor Pro Tempore, called the May 10, 2017 meeting to order. (D. Ex. 1)

72.     Scott Wilson announced the public comment policy of the Metropolitan Council as follows:

> This is a public meeting. In accordance with Title 1, Sections
> 1.2(c)(9) and 1.7(a) of the Code of Ordinances, all items on this
> agenda are open for public comment with the exception of those
> items listed as "Introductions". Items listed as "Introductions" will be
> available for public comment at subsequent meetings. Those
> members of the public desiring to speak on a particular item should
> refer to a meeting agenda and fill out a request to speak card
> indicating which item they wish to speak on and place it in the
> designated location prior to the meeting. Once the item is announced,
> each person's name who has filled out a card will be called on to
> speak for the amount of time so designated by the Pro-Tem.
> (D. Ex. 1 and D. Ex. 6)

73.    After reciting the public comment policy, Scott Wilson stated,

> "Ladies and Gentlemen, I'd like to make an announcement.  If any
> disruption or interfering with the meeting will be removed by any
> individual that disrupts the meeting.  They will be removed."
> (D. Ex. 1)

74.    At the May 10, 2017 meeting, Scott Wilson invited the public to make comment on Agenda

Item 50.  (Established Fact No. 5 in Pretrial Order.)  See D. Ex. 2.

75.    Agenda Item 50 item was regarding "Authorizing settlement of the claim of Glen Boudreaux

for damages resulting from a sewer back-up in the claimant's home, for a total amount of

$25,238.13."  (Established Fact No. 6 in Pretrial Order.)  (See also D-6 and D-7.)

76.    The established fact above represents only a partial recitation of Agenda Item 50.  The

Agenda item concludes: "...which amount shall be paid from the account designated

"Insurance–General Liability".  See D. Ex. 6.

77.    D. Ex. 7, the item 50 attachment to Council 5/10/17, shows that the item before the Council

was whether or not to approve the resolution found in the attachment.

78.    A gentleman identifying himself as Mike McClanahan, President of the Baton Rouge

NAACP, approached the podium and stated: "I am speaking against this proposed item on the

agenda today as a citizen of the community."  McClanahan expressed his belief that it was his constitutional right....

79.    Mayor Pro Tempore Wilson inquired, "You're speaking on what?  We've got an item about a sewer back-up, Item 50, that's what we're talking about."

80.    A colloquy ensued including input from unknown speakers, regarding how public comments should work.  Mayor Pro Tempore Wilson responded that he wasn't going to argue with Mr. McClanahan, and advised Mr. McClanahan, "you can either talk on the item or..." (interruption).

81.    Mr. McClanahan then stated "It is my constitutional right to express why I oppose this item because on July 5, 2016, Alton Sterling was killed and you all ...".

82.    It was at this point that the Mayor Pro Tempore asked the deputy to "take him out", that is, to remove Mr. McClanahan from the podium.

83.    The comments of Mr. McClanahan were off-topic, and did not address or apply to Item 50 but rather in fact addressed other unrelated topics.  See D. Ex. 2.

84.    Michael McClanahan admitted that his comments made on May 10, 2017, on Item 50 has nothing to do with Item 50.  (See D. Ex. 43, pp 28-31, particularly p. 30, lines 21 through p. 31, line 6.)

85.    When deposed on January 14, 2019, Michael McClanahan had no complaint about being removed from the podium.  He in fact stated, "All I know is that we were given an opportunity to speak on an issue that was unresolved, and we spoke.  And they gave us three or four minutes to speak our peace and go on about our business."  (D. Ex. 43, p. 17)

86.    At the May 10, meeting, Scott Wilson invited the public to make comment on an Agenda Item 51.  (Established Fact No. 7 in Pretrial Order.)

-13-

87. Agenda Item 51 item was regarding "Authorizing settlement of the claim of Cornel Hubert for damages resulting from a sewer back-up in the claimant's rental unit, for a total amount of $22,400.03" (Established Fact No. 8 in Pretrial Order.)  (See also D-6 and D-8.)

88. The established fact recitation is not complete....add: which amount shall be paid from the account designated Insurance-General Liability."  See D. Ex. 8.

89. A gentleman, later learned to be Gary Chambers, approached the podium, talking while walking up, and before reaching the podium, failed to introduce himself, and stated "So you guys are going to rob me of my constitutional rights to say what I believe needs to be said."

90. At that point the Mayor Pro Tempore advised the speaker than he could either speak on the item or ...

91. Chambers continued to speak off-topic saying "and have the police department..."

92. Whereupon the Mayor Pro Tempore asked the deputy to please take the speaker out.

93. Gary Chambers said he was not going to leave and that he had three minutes on the clock.

94. The Mayor Pro Tempore again informed him that he had to speak on the item.

95. At which point Mr. Chambers stated "Again I say Alton Sterling was murdered on July 5" and then called Scott Wilson a coward twice "for putting people out of the room."

96. On his way out, Chambers continued to say it was his civil right to be there.

97. The comments made by Mr. Chambers were off-topic and did not relate in any way to Item 51.

98. Gary Chambers had been removed from Council meetings before for giving political speeches and being off-topic with public comments.  See D. Ex. 41.

99. At the May 10 meeting, Scott Wilson invited the public to make comment on an Agenda Item

-14-

60.  (Established Fact No. 9 in Pretrial Order.)

100.    Agenda Item 60 item was regarding "Expressing the opposition of the Metropolitan Council to House Bill 276 filed in the 2017 Session while under officer involved incident investigations." (Established Fact No. 10 in Pretrial Order.)  (See also D-6 and D-10.)

101.    A total of six individuals attempted to speak on Item 60.  (D-5)

102.    The first speaker, a Ms. Mora appeared at the podium twice, made her public comments the first time, but was asked to leave the second time because she had already spoken on the item.

103.    An unknown female waving a handkerchief in the air appeared near the podium while another speaker was speaking, yelling something unintelligible, and was removed.

104.    A female, Colby Weaver, was initially warned that her comments about a "culture of hate" appeared to be off-topic regarding the legislation at issue.

105.    When Ms. Weaver later mentioned Alton Sterling, the Mayor Pro Tempore warned her to keep to the item at issue which did not include Alton Sterling.

106.    Ms. Weaver then advised that she was not addressing Alton Sterling.  It was at this point that the hankie waving lady interrupted Ms. Weaver's comments and was removed.

107.    After removal of the hankie waving lady, Ms. Weaver again mentioned Alton Sterling and July 5 at which time the Mayor Pro Tempore asked that Ms. Weaver be escorted out.

108.    The next speaker approaching the podium was Sydney Epps, who called for the "immediate termination of Baton Rouge Chief of Police Carl D'Abadie as well as the officers involved, Blaine Salamoni and Howie Lake."

109.    Whereupon the Mayor Pro Tempore asked that Ms. Epps be taken out.

110.    Ms. Epps continued to argue over her removal to no avail.

111.    Next Ms. Mora, the first speaker on this item, returned to the podium, waiving her arms,

whereupon the Mayor Pro Tempore advised that she had already spoken and was asked to sit down.

112.    Upon her refusal to do so, the Mayor Pro Tempore asked that she be taken out.

113.    The last speaker, later learned to be Eugene Collins, walked up to the podium and began to

speak.

114.    The audio is hard to hear but Eugene Collins has admitted in paragraph 39 of the Amended

Complaint that he said at least "I oppose this motion because on July ...".

115.    When his deposition was taken on January 14, 2019, Eugene Collins was unable to recall

what he said before he was ordered removed from Council Chambers on May 10, 2017. (D. Ex. 45,

p. 24)

116.    The Mayor Pro Tempore requested that Eugene Collins be escorted out.

117.    The removal of each of these individuals was proper.

118.    Ms. Mora was allowed to speak once but not twice.

119.    The hankie waiving lady was removed for disrupting another speaker.

120.    Ms. Colby, Ms. Epps and Mr. Collins were all removed for being off-topic.

**II.    Conclusions of Law**

1.    This Court lacks subject matter jurisdiction to decide this case.  Defendant's motion to

dismiss should be granted and the case dismissed with prejudice at plaintiffs' cost.

**Alternatively**

1.    § 4.05 of the Plan of Government for the City of Baton Rouge/Parish of East Baton Rouge

requires the President Pro Tempore to preside over meetings of the Metropolitan Council with the

right to speak and vote. Further, § 1:7(a) of the Code of Ordinances permits members of the public

to speak "on any item included in the agenda."

2.    The City/Parish, its Metropolitan Council, and the chairman of that Council, are required to

abide by state law, including Louisiana's Open Meetings Law.

3.    Baton Rouge Code of Ordinances, § 1.7(a), makes explicit reference to La. R.S. 42:5(D), a

component of the Open Meetings Law (since redesignated as La. R.S. 42:14(D)).  It provides in

relevant part:

> Except school boards, which shall be subject to R.S. 42:15, each
> public body conducting a meeting which is subject to the notice
> requirements of R.S. 42:19(A) **shall allow a public comment period**
> at any point in the meeting prior to action on an agenda item upon
> which a vote is to be taken. The governing body may adopt
> reasonable rules and restrictions regarding such comment period.
> (emphasis added)

4.    Several Attorney General Opinions have addressed the subject.

> In answer to your second question, it is the opinion of this office that
> the intent of this statute is to afford the public a right to comment on
> issues being discussed at each particular meeting. **It is not intended
> to give the public a chance to address the council on issues
> unrelated to those being discussed at the meeting**. Items subject to
> public comment include those items found on the agenda and items
> added to the agenda by the board during the meeting. Therefore, the
> public comment requirement of La. R.S. 42:5(D), generally applies
> to agenda items only (emphasis added). See La. Atty. Gen. Op. No.
> 01-367, 2002 WL 242016.

5.    "Although La. R.S. [42:14] clearly provides for public comment, this right has been

interpreted to apply only to a public body's consideration and deliberation of agenda items. See, La.

Atty. Gen. Op. No. 08-0325, 2009 WL 685303.

6.    As opined by the Attorney General, there are hazards involved in taking up items not properly

noticed on the Agenda, because doing so risks the type of "subterfuge" that may defeat the purposes

-17-

of the Open Meetings Law. See, La. Atty. Gen. Op. No. 08-0325, 2009 WL 685303.

7.     Finally, while the Open Meetings Law broadly provides for members of the public to attend

all public meetings, there are exceptions. Per La. R.S. 42:17(C):

> The provisions of this Chapter shall not prohibit the removal of any
> person or persons who **willfully disrupt** a meeting to the extent that
> orderly conduct of the meeting is seriously compromised.
> (emphasis added)

8.     The Louisiana Attorney General, in response to a request for clarification from Mr. John

Diasselliss, Asst. District Attorney for St. John the Baptist Parish, clarified the right of the Chairman

of a public meeting to order the removal of an individual who refuses to comply with the Chair's

orders:

> Considering this provision, it is the provision of this office that a
> person or person, even an appointed or elected official, who willfully
> disrupt a meeting to an extent that orderly conduct of the meeting is
> seriously compromised may be removed, by lawful force if necessary.
> Under these circumstances, **the open meetings law is not violated**
> **by removing the disruptive person** or official from the meeting.
> (emphasis added) See, La. Atty. Gen. Op. No. 91-19, 1991 WL
> 57273.

9.     President Pro Tempore Wilson, as chair of the Metropolitan Council meeting on May 10,

2017, had an extraordinary obligation to ensure the meeting was conducted in accordance with City

and Parish Ordinances, the Plan of Government, and the Open Meetings Law. The evidence at trial

will show that he did so on May 10, 2017.

10.    As discussed by the Fifth Circuit in *Heaney v. Roberts*, 846 F.3d 795 (5th Cir. 2017), the

Constitutional right at issue in a viewpoint discrimination claim is the First Amendment right to be

free from viewpoint discrimination in a limited public forum.

11.    The meeting of the Metropolitan Council qualifies as a limited public forum.

-18-

12.    The government can restrict or regulate speech in a limited public form "as long as the regulation '(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum'."

13.    A claim of viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint discriminatory purpose.

14.    The Fifth Circuit held in *Heaney v. Roberts*, *supra*, 802, "If Heaney were to have violated a reasonable restriction, such as a topic or time constraint, there would be no constitutional violation."

15.    Each plaintiff violated a reasonable restriction, each plaintiff was not discussing the agenda item but rather talking off topic.

16.    Accordingly, no constitutional violation can be found by the Court.

17.    The Fifth Circuit even goes on to state that "No violation occurs when the same result would have occurred in the absence of any illegitimate motive."

18.    It is only if a plaintiff was not silenced for violating a reasonable restriction that the First Amendment claim would turn on the Mayor Pro Tempore's motive or intent.

19.    It appears that plaintiffs base their claims and the facts they believe they need to prove at trial on *Heaney v. Roberts*, 846 F.3d 795 (5th Cir. 2017). The case is procedurally distinguishable, as the official presiding at the meeting of the Gretna City Council, defendant Christopher Roberts was sued in his individual capacity, and defendants, Jefferson Parish and the City of Gretna, were sued as vicariously liable.

20.    In the case before the Court, Scott Wilson is sued in his official capacity as Mayor Pro Tempore of the City of Baton Rouge, Parish of East Baton Rouge, equivalent to, redundant to and

the same as suing the entity itself, City of Baton Rouge/Parish of East Baton Rouge. (See Doc 121-1).

21.    *Monell v. Dept. of Social Services of the City of New York*, 98 S.Ct. 2018 (1978), throws a kink in the plaintiffs' limited evaluation of the *Heaney* case. "A plaintiff asserting a Section 1983 claim against a municipal official in his official capacity or a Section 1983 claim against a municipality 'must show that the municipality has a policy or custom that caused his injury.

22.    To establish official policy, plaintiff must prove any of the following: 1. A copy, statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's law making officers or by an official to whom the lawmakers have delegated the policy making authority; or 2. A persistent, widespread practice of the officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy making authority." See *Lefebure v. Boeker*, 390 F.Supp.3d 729, 754 (U.S. D.Ct. M.D. La 6/25/19).

23.    Plaintiffs have not sustained this burden of proof.

24.    Plaintiffs have not identified an express policy that led to the alleged deprivation of their constitutional rights, or an express policy of shutting down black people and allowing white people to talk (ridiculous to assume the council would ever adopt such a policy.)

25.    The only policy shown is the council's adherence to the Open Meetings Law, referenced in the Plan of Government, which Open Meetings Law is not intended to give the public a chance to address the council on issues unrelated to those being discussed at the meeting and which provisions

do not prohibit the removal of persons or persons who willfully disrupt a meeting to the extent that

orderly conduct of the meeting is seriously compromised. The open meetings law was not violated

by removing plaintiffs for talking off topic on specific agenda items.

26.    The May 10, 2017 meeting, particularly with respect to the "removal" of the three plaintiffs

for speaking off topic during the public comment time for a particular agenda Items, was conducted

in accordance with the City and Parish Ordinances, the Plan of Government, the Open Meetings

Law, as well as Louisiana Attorney General opinions authorizing the actions taken.

Respectfully submitted:


s/Celia R. Cangelosi
CELIA R. CANGELOSI
(Bar Roll No. 12140)
5551 Corporate Blvd., Suite 101
Baton Rouge, LA 70808
PHONE: (225) 231-1453
FAX: (225) 231-1456
celiacan@bellsouth.net

*Attorney for Defendant, Scott Wilson, in his official capacity as Mayor Pro Tempore of the City of Baton Rouge, Parish of East Baton Rouge*