UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

**MICHAEL MCCLANAHAN ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 17-1720-JWD-SDJ**

**SCOTT WILSON ET AL.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following are the Court's Findings of Fact and Conclusions of Law deciding the claims by Plaintiffs Michael McClanahan, Gary Chambers, and Eugene Collins against Defendant Scott Wilson in his official capacity as Mayor Pro Tempore of the City of Baton Rouge. If any of the following findings of fact are in truth conclusions of law, or if any conclusions of law are in truth findings of fact, the Court deems them so.

## I. FACTUAL BACKGROUND

1.    This action stems from the removal of Plaintiffs Michael McClanahan, Gary Chambers, and Eugene Collins from a Baton Rouge Metropolitan Council meeting on May 10, 2017. (Doc. 110 at 2, 4, 7.) Plaintiffs are all Black men. (Doc. 194 at 18, 26, 90.)

2.    Plaintiffs intended to address the Council about their concerns with the Metro Council's lack of action regarding the killing of Alton Sterling, who was shot by officers with the Baton Rouge Police Department nearly one year earlier on July 5, 2016.[1] (*Id.* at 23, 28–29, 93–94.)

---

[1] *See* Press Release, U.S. Dep't of Justice, Federal Officials Close Investigation Into Death of Alton Sterling (May 3, 2017), https://www.justice.gov/archives/opa/pr/federal-officials-close-investigation-death-alton-sterling (last accessed September 9, 2025) [hereinafter "DOJ Press Release"].

3.    The United States Department of Justice had opened an investigation into the shooting, which it then closed on May 3, 2017, without bringing charges against the officers, Blane Salamoni and Howie Lake, II. (Doc. 110 at 6.) *See* DOJ Press Release.

4.    Plaintiffs attended the Metro Council Meeting on May 10, 2017, to express their displeasure with the Metro Council's lack of action in response to the situation. (Doc. 194 at 18, 23, 28–29, 93–94.) How they proposed to do so, and the actions taken by Scott Wilson in his role as Mayor Pro Tempore and chairman of the Baton Rouge Metro Council at that meeting, are at issue here.

5.    Plaintiff McClanahan was then the Louisiana State Conference President for the National Association for the Advancement of Colored People ("NAACP") and the Baton Rouge Branch NAACP President. (Doc. 194 at 18.)

6.    Plaintiff Chambers was then the publisher of the Rouge Collection. (*Id.* at 26.)

7.    Plaintiff Collins was then the "director of the largest standing STD clinic in this region." (*Id.* at 89–90.)

8.    All three of them had previously attended many Metro Council meetings and had made public comments at many of those meetings. (*Id.* at 24, 29–30, 90–91.)

9.    During the May 10, 2017, Metro Council meeting, Plaintiffs and several other community members were ordered removed from the meeting. (Doc. 110 at 2, 4; Doc. 194 at 162.)

10.    Plaintiff Chambers was arrested. (Doc. 194 at 29.)

11.    Plaintiffs then brought this suit on December 4, 2017. (Doc. 1.)

## II.    SUMMARY OF FACTUAL AND LEGAL ISSUES

12.    The main factual and legal issues to be resolved are:

2

*A.* Have Plaintiffs established a final policymaker and official policy for the purpose of *Monell* liability?

*B.* Have Plaintiffs shown by a preponderance of the evidence that their removal from the podium violated their First Amendment rights? That is, have Plaintiffs shown:

    i.   that they were not violating reasonable restrictions on their speech; and

    ii.   that Wilson acted with improper motive?

*C.* Have Plaintiffs shown by a preponderance of the evidence that their removal from the Metro Council meeting room violated a separate First Amendment right to remain in the chamber?

*D.* Have Plaintiffs shown by a preponderance of the evidence that Collins' removal from the podium constituted a violation of the doctrine of prior restraint?

*E.* Have Plaintiffs shown by a preponderance of the evidence that Wilson engaged in racial discrimination in violation of their Fourteenth Amendment rights?

### III.   PROCEDURAL HISTORY

13.   Plaintiffs first brought this action on December 4, 2017, against both Defendant Scott Wilson in his official capacity as Baton Rouge Mayor Pro Tempore and against the City of Baton Rouge. (Doc. 1 at 1.) Plaintiffs then amended their complaint on December 12, 2017. (Doc. 2.)

14.   On July 9, 2019, Plaintiffs moved to strike, (Doc. 32), the jury demand made by Defendants in their pre-trial order, (Doc. 11), which Defendants opposed, (Doc. 36), and which the Court granted on July 31, 2019, (Doc. 43).

15. On August 5, 2020, Plaintiffs voluntarily dismissed their claims against the City of Baton Rouge/Parish of East Baton Rouge with prejudice, reserving their claims against Defendant Wilson. (Doc. 104; *see* Doc. 105.)

16. On January 28, 2021, the Court denied Defendant's *Motion to Dismiss*, (Doc. 121), Defendant's *Motion for Expedited Consideration of Motion to Dismiss*, (Doc. 122), and Plaintiffs' *Motion for Leave to File Second Amended Complaint*, (Doc. 147). (Doc. 159.)

17. Defendant Wilson then appealed this ruling to the Fifth Circuit. (Doc. 160.) The Court declined to stay the matter pending appeal. (Docs. 169, 173.)

18. The Fifth Circuit similarly denied Defendant's motion for a stay pending appeal. (Doc. 176.)

19. On March 9, 2021, the Court granted in part and denied in part *Defendants' [sic] Motion in Limine* (Doc. 114) and *Plaintiffs' Motion in Limine* (Doc. 115). (Doc. 177.)

20. Defendant asked the Court to reconsider this ruling, (Doc. 180), which Plaintiffs opposed, (Doc. 181), and the Court denied, (Doc. 183).

21. On March 12, 2021, the parties "clarif[ied] the record to reflect (1) that Scott Wilson is no longer a member of the Metro Council; (2) that LaMont Cole is the elected Mayor Pro Tempore; and (3) that Cole in his official capacity has been substituted as Defendant in this matter." (Doc. 188 at 1.) Given that the events at issue in this action concern Mr. Wilson, the Court will continue to refer to Defendant as Wilson, but acknowledges that Defendant in this matter is the Mayor Pro Tempore in his official capacity, regardless of which individual holds that office at the moment.

22.    A bench trial was held on March 17, 2021.[2] (Doc. 191.)

23.    The parties then filed proposed findings of fact on May 25, 2021. (Docs. 195, 196.) Plaintiffs requested to substitute their proposed findings of fact and conclusions of law, which the Court permitted. (Doc. 198.)

24.    Defendant filed a separate post-trial brief. (Doc. 197.) Plaintiffs filed a rebuttal on June 5, 2021, (Doc. 200), and Defendant filed an additional post-trial memorandum, (Doc. 201).

25.    On July 29, 2021, the Fifth Circuit issued a per curiam order denying Defendant's interlocutory appeal for want of jurisdiction. (Docs. 202, 203.)

## IV.    PARTIES' ARGUMENTS

### A.    Summary of Plaintiffs' Arguments

26.    Plaintiffs argue that Scott Wilson, acting in his official capacity as Mayor Pro Tempore, violated Plaintiffs' constitutional rights. (Doc. 198 at ¶ 129.)

27.    They argue that as Mayor Pro Tempore, Wilson made the decision to remove each of the Plaintiffs from the meeting room, depriving them of their rights to speak. (*Id.* at ¶¶ 123–128.)

28.    Plaintiffs contend that Wilson was "the final decision and policy maker for the City/Parish of Baton Rouge about whether someone should be removed during public comment." (*Id.* at ¶ 127.)

29.    As such, they assert, Wilson's acts as Mayor Pro Tempore are sufficient to establish *Monell* liability as to the City of Baton Rouge. (*Id.* at ¶ 123.)

---

[2] At the bench trial, the Court allowed multiple exhibits into evidence subject to objections for relevance to be ruled upon following the trial. Those exhibits discussed in these Findings of Fact and Conclusions of Law are deemed admitted as relevant for the purposes for which the Court relies upon them herein.

30.    Plaintiffs state five different theories of liability under which Wilson violated Plaintiffs'
constitutional rights. (*Id.* at ¶ 129.)

31.    First, Plaintiffs argue, "Wilson engaged in viewpoint discrimination when he expelled
Plaintiffs even though they were speaking on topic." (*Id.*)

32.    Second, "[e]ven if Plaintiffs were off topic, Defendant Wilson engaged in viewpoint
discrimination when he expelled Plaintiffs and others who mentioned Alton Sterling or
criticized the police, but chose not to expel other off-topic persons who did not mention
Alton Sterling or criticize the police." (*Id.*)

33.    These two theories, Plaintiffs argue, "involve the doctrine of viewpoint discrimination in
violation of the First Amendment." (*Id.* at ¶ 130.)

34.    As their third theory, Plaintiffs argue "[e]ven if it was permissible for Defendant Wilson
[to] remove Plaintiffs from the public comment podium, Plaintiffs had an independent First
Amendment right to remain in the chamber and attend the meeting." (*Id.* at ¶ 129.) This
theory "involves the Plaintiffs' 'First Amendment right to attend a public meeting.'" (*Id.* at
¶ 131 (quoting *Heaney v. Roberts*, 147 F. Supp. 3d 600 n.10 (E.D. La. 2015) [hereinafter
*Heaney I*]).)

35.    Fourth, Plaintiffs argue, "Defendant Wilson violated the doctrine of prior restraint when he
ordered Eugene Collins removed before Collins could speak." (*Id.* at ¶ 129.) This theory
"involves the doctrine of prior restraint in violation of the First Amendment." (*Id.* at ¶ 132.)

36.    Finally, Plaintiffs contend, "Plaintiffs are Black, and Scott Wilson treated them differently
than white speakers on account of their race." (*Id.* at ¶ 129.) This final theory "involves the
doctrine of equal protection as guaranteed by the Fourteenth Amendment." (*Id.* at ¶ 133.)

37.    With respect to the first two theories, Plaintiffs argue that the government may not engage in viewpoint discrimination in violation of the First Amendment. (*Id.* at ¶ 136.)

38.    Plaintiffs contend that "a city or parish council meeting is a limited public forum." (*Id.* at ¶ 139.) As such, they argue, "the government may apply reasonable time, place, and manner restrictions to speech"—but it may not engage in viewpoint discrimination. (*Id.*)

39.    While it may "require speakers during public comment at a meeting to remain on-topic[,]" (*id.*), Plaintiffs contend that at a meeting with such a rule, "on-topic speech is treated as if it were in a traditional public forum, and <u>any</u> restriction is subject to strict scrutiny." (*Id.* at ¶ 141 (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001)).)

40.    Off-topic speech, on the other hand, "receives less protection, but still cannot be subject to viewpoint discrimination." (*Id.*) Plaintiffs argue that a rule requiring speakers to stay on topic during public comment, however, does not allow the government to "selectively enforce that rule in a manner that constitutes viewpoint discrimination." (*Id.* at ¶ 142.)

41.    Plaintiffs contend that "judicial scrutiny must be even more exacting[]" when the speech that is restricted is "political in nature[.]" (*Id.* at ¶ 145.) Plaintiffs do not challenge the Baton Rouge Code of Ordinances or the Louisiana Open Meetings Law on their face; instead, they "are raising an *as-applied* challenge, because government agents may only enforce topic rules in a manner 'consistent with the First Amendment.'" (*Id.* at ¶ 146 (quoting *Heaney I*, 147 F. Supp. 3d at 605).)

42.    Plaintiffs argue that "the 'government cannot under any circumstances . . . restrict speech based on viewpoint' – even if the government has facially neutral topic rules." (*Id.* (quoting *Heaney I*, 147 F. Supp. 3d at 605).)

43.    Under these theories, then, Plaintiffs assert that the pivotal question is whether Wilson "was motivated to expel Plaintiffs due to the 'opinion or perspective of the speaker,'" and if the answer is yes, that he violated Plaintiffs' First Amendment rights. (*Id.* at ¶ 147.)

44.    Plaintiffs argue that the Court can infer improper motive because Wilson "expel[led] some people for speaking off-topic, but not others." (*Id.* at ¶ 148.)

45.    According to Plaintiffs, all seven of the community members Wilson ordered removed from the Metro Council meetings held on May 10, 2017, and June 28, 2017, "were there to talk about the police killing of Alton Sterling and their criticism of the Baton Rouge Police Department." (*Id.* at ¶¶ 150–51.)

46.    Plaintiffs argue that Wilson "ordered the police to remove these seven citizens after they said the words 'Alton Sterling,' or criticized the police – or if Mr. Wilson thought they planned to talk about one of those topics." (*Id.* at ¶ 152.)

47.    Plaintiffs argue that although McClanahan and Chambers "spoke on topics of city business that were not directly related to Alton Sterling or the police[,]" they "were still on-topic, because it was their viewpoint that the Baton Rogue government should not return to business-as-usual without first resolving how to respond to the killing of Alton Sterling." (*Id.* at ¶¶ 154–55.)

48.    Plaintiffs argue that McClanahan clearly articulated this, "saying, 'I oppose the sewer item because on July the fifth, 2016, Alton Sterling was killed and your office continued to conduct business as usual. Since that time, the City of Baton Rouge has continued to conduct business – and I oppose this because that is not right.'" (*Id.* at ¶ 155.)

49.    Plaintiffs point to the public comments of community member Lillard who "express[ed] the same theory of being on-topic" when he "said, 'I'm against Item 76 because the other item shouldn't have passed, okay.'" (*Id.* at ¶ 156.)

50.    Plaintiffs contend that Collins "was even more specifically on-topic[]" when he "spoke during Agenda Item 60[,]" which "'[e]xpress[ed] the opposition of the Metropolitan Council to House Bill 276 filed in the 2017 Session while under officer involved incident investigations.'" (*Id.* at ¶ 157.)

51.    According to Plaintiffs, "the Alton Sterling killing was the 'driving force' behind House Bill 276." (*Id.* at ¶ 158.) "Thus, Collins approaching the podium to speak about Alton Sterling was directly on-topic." (*Id.* at ¶ 159.)

52.    Plaintiffs urge the Court to apply strict scrutiny, arguing that "[i]n [a] limited public forum with an on-topic rule, any restriction on on-topic speech is subject to strict scrutiny." (*Id.* at ¶ 160 (citing *Chiu*, 260 F.3d at 347).)

53.    "Under the strict scrutiny standard, 'the Government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" (*Id.* (quoting *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin* (5th Cir. 2020) (internal citations omitted)).)

54.    Plaintiffs argue that "[s]pecifically, the 'State must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject.'" (*Id.* (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55 (1983)).)

55.    They argue that the Government has not shown any "compelling reason for restricting Plaintiffs' speech[,]" which would have taken "a grand total of nine minutes of speech[]" within the public comment period. (*Id.* at ¶ 161.)

56.   Plaintiffs further argue that Wilson's remedy was not narrowly tailored, as he did not merely request that they sit down or "ask[] police to escort them back to their seats, rather than remov[e] them entirely from the meeting hall." (*Id.*)

57.   Next, Plaintiffs argue that even if they were off-topic, Wilson still engaged in viewpoint discrimination by expelling Plaintiffs without expelling other off-topic speakers. (*Id.* at ¶¶ 163–82.)

58.   They contend that "[e]ven if a person is speaking off-topic in a limited public forum, his or her speech still may not be restricted due to viewpoint discrimination." (*Id.* at ¶ 163.)

59.   Plaintiffs assert that "[v]iewpoint discrimination may be inferred from the differential treatment of off-topic speakers who speak from different viewpoints." (*Id.* at ¶ 164 (citing *Heaney I*, 147 F. Supp. 3d at 606 n.4).)

60.   Plaintiffs argue that neither of Defendant's "two viewpoint-neutral explanations for his actions[]" are supported by the evidence. (*Id.* at ¶ 167.)

61.   First, they look to Wilson's argument that "he was merely enforcing Section 1.7(a) of the Baton Rouge Code of Ordinances, which requires that speakers remain on-topic during public comment." (*Id.* at ¶ 168.)

62.   Plaintiffs argue that trial evidence contradicts this, indicating that "[w]hen [other] people spoke off-topic but did not mention Alton Sterling or criticize the police, Mr. Wilson treated them with solicitude and tried to gently guide them back to the topic at hand." (*Id.* at ¶ 169.)

63.   Plaintiffs point to community members Janice Weber and Dan Weber's interactions with Wilson, among others—including Plaintiff Chambers' own interaction with Wilson when speaking off-topic on another occasion without mentioning Alton Sterling or the police. (*Id.* at ¶¶ 169–71.)

64.     Plaintiffs contend that unlike in those interactions, they were removed on May 10, 2017, for mentioning Alton Sterling or the police, and that no speakers were removed for being off topic *unless* they mentioned Alton Sterling or the police. (*Id.* at ¶¶ 172–73.)

65.     Instead, "Wilson usually 'just let them finish and then let them sit down.'" (*Id.* at ¶ 174.)

66.     Plaintiffs argue that "the preponderance of the evidence shows that Defendant selectively enforced the 'on-topic rule' to silence speakers who mentioned Alton Sterling or criticized the police." (*Id.* at ¶ 175.)

67.     Plaintiffs contend that even if Wilson did believe "there was something unique about May 10, 2017, in that he had received word that protestors planned to be disruptive and 'shut down' the City Council meeting[,]" Plaintiffs' behavior at the meeting showed that their "chosen method was merely [to] use their right to provide public comment—*i.e.*, no true threat at all." (*Id.* at ¶¶ 176–77.)

68.     Plaintiffs also argue that May 10, 2017, was not unique because Wilson also ordered another community member, Arthur Reed, removed on June 28, 2017, as soon as he mentioned "'the Alton Sterling situation' during public comment[.]" (*Id.* at ¶ 178.)

69.     Plaintiffs also argue that their actions—speech during their three minutes of public comment—was not disruptive. (*Id.* at ¶ 179–80.) As a result, they contend that it is clear that Wilson engaged in viewpoint discrimination. (*Id.* at ¶ 182.)

70.     In addition, Plaintiffs assert that Wilson engaged in unlawful prior restraint of Collins' speech because he ordered Collins removed "because of what Wilson *thought* Collins would say." (*Id.* at ¶ 186.) They argue that Wilson based Collins' removal on his guess that Collins was going to speak about Alton Sterling. (*Id.* at ¶ 187.)

71.    However, Plaintiffs assert that Collins' removal prior to being allowed to speak constituted prior restraint without adequate justification. (*Id.* at ¶ 190.)

72.    Next, Plaintiffs argue that they "have a 'First Amendment right to attend a public meeting[]'" that is separate from their right to free speech. (*Id.* at ¶ 191 (quoting *Heaney I*, 147 F. Supp. 3d at 609 n.10).)

73.    Plaintiffs assert that their removal from the meeting room was a separate First Amendment violation that does not withstand strict scrutiny. (*Id.* at ¶¶ 193–96.)

74.    Finally, Plaintiffs argue that Wilson engaged in racial discrimination by removing Black speakers more quickly than White speakers for similar speech on the topic of Alton Sterling. (*Id.* at ¶¶ 199–200.)

**B.    Summary of Defendant's Arguments**

75.    Defendant acknowledges that the Metro Council meeting "qualifies as a limited public forum." (Doc. 196 at 45.)

76.    However, he contends that a) the government is permitted to restrict speech in a limited public forum so long as it does not engage in viewpoint discrimination and the restrictions are reasonable in light of the forum's purpose; b) Plaintiffs must show that he "acted with a viewpoint discriminatory purpose[]"; and c) that Plaintiffs cannot do so. (*Id.*)

77.    Instead, Defendant asserts, "[e]ach Plaintiff violated a reasonable restriction[.]" (*Id.*) He argues that McClanahan and Chambers were off-topic and that Collins "created bedlam in the Council Chambers[.]" (*Id.*)

78.    Defendant asserts that the Metro Council was authorized to remove anyone who willfully disrupted a meeting, arguing that under Louisiana state law, the Open Meetings Law "'shall not prohibit the removal of any person or persons who **willfully disrupt** a meeting to the

extent that orderly conduct of the meeting is seriously compromised.'" (*Id.* at 5 (quoting La. R.S. 42:17(C)).)

79.  Defendant also argues that Wilson had the responsibility to "ensure the meeting was conducted in accordance with City and Parish Ordinances, the Plan of Government, and the Open Meeting Law, as well as any reasonable rules and restrictions adopted by the Metro Council." (*Id.*) He argues that this includes ensuring that the meeting ended by 8:00 p.m., which Defendant contends was required by City Ordinance. (*Id.* at 5–6.) Defendant does not cite to any specific City Ordinance requiring this. (*Id.*)

80.  According to Defendant, Wilson was aware of Plaintiffs' intent to attend the meeting because of "a flyer that had been posted" to Plaintiff Chambers' social media profile. (Doc. 196 at 6.) He was aware of this because earlier on May 10, 2017, Johnny Dunnam, who was serving as Sergeant-at-Arms for the Metro Council meeting, had shown Wilson a post made by Chambers to his social media. (*Id.*)

81.  Following a discussion between Dunnam and Wilson about the flyer posted to Chambers' social media, "Dunnam arranged for extra security for the May 10, 2017 Metro Council Meeting." (*Id.* at 7.)

82.  Defendant states that Chambers and McClanahan "were part of a group effort to speak on every item on the agenda at the Metro Council meeting on May 10, 2017, to ensure that the Metro Council addressed the Alton Sterling matter." (*Id.*) He asserts that Plaintiffs' goal was "to not let the Metro Council do other business." (*Id.*) Defendant contends that Plaintiffs' "purpose was to demand that the Mayor fire the Chief of Police and two officers [involved] in the death of Alton Sterling[.]" (*Id.* at 8.) According to Defendant, "[t]he concerns that they intended to convey at the May 10, 2017 meeting was that they were

against the City continuing to do business as usual in spite of it not coming to a conclusion on the Alton Sterling matter." (*Id.*)

83.    Defendant asserts that Chambers had been escorted "out of a prior Metro Council meeting for speaking out of turn and interrupting." (*Id.* at 9.)

84.    Defendant contends that on May 10, 2017, the Metro Council did not follow its normal procedure of requiring speakers to complete comment cards to participate in public comment. (*Id.* at 9–12.) At the same time, he asserts that "[n]o members of the public sent in comment cards or requested to speak" on the agenda items in question in this case, Items, 50, 51, and 60. (*Id.* at 12.)

85.    Instead, Wilson "invited the public" to make comments. (*Id.* at 13.)

86.    Defendant argues that McClanahan did not speak on the topic of Agenda Item 50, which would have authorized a settlement for damages resulting from a sewer backup, but was instead argumentative and disruptive, resulting in his removal. (*Id.* at 13–15.) Defendant also argues that McClanahan was "responsible for the disruptive nature of the audience actions as he had asked for and encouraged their attendance." (*Id.* at 15.)

87.    According to Defendant, McClanahan was warned three times to speak on the topic and was only removed after ignoring all three warnings. (*Id.* at 16.) Defendant also makes much of the fact that McClanahan "continued to speak" while he was being removed. (*Id.* at 17.)

88.    Defendant asserts that McClanahan was therefore willfully disruptive. (*Id.* at 18.)

89.    Likewise, Defendant asserts that Chambers was "totally disruptive[.]" (*Id.* at 24.) Defendant points to Chambers' comments upon approaching the podium, which he contends were "'So you guys are gonna rob me of my constitutional rights to say what I believe needs to be said…'" (*Id.* at 19.) Defendant argues that this "had nothing to do with

the topic of Item 51." (*Id.* at 22.) He also argues that Chambers "failed to heed the first warning and continued to talk off topic[,]" (*id.* at 22), making "comments about 'the police department who you are responsible for[,]'" (*id.* at 23), and so was ordered removed, (*id.*)

90.    Defendant acknowledges that when Chambers stated "that 'Alton Sterling was murdered on July the 5th'. . . the Mayor Pro Tempore asked Lt. Cpl. Dunnam for the second time to take Mr. Chambers out[.]" (*Id.* at 23–24.) He asserts that Chambers continued to call Wilson "a 'coward' while struggling not to be removed from the podium[]" and "continued to struggle while being removed." (*Id.* at 23.)

91.    According to Defendant, it was Chambers' "unruly and disruptive behavior" in the hall outside of the Metro Council meeting that prompted Dunnam to arrest Chambers. (*Id.* at 24.) Defendant asserts that "[a]ll of this totally disruptive behavior allowed the removal of Mr. Chambers from the Council room, as it interfered with the orderly and efficient progress of the Metro Council meeting in an extreme and inexcusable manner." (*Id.*)

92.    Defendant then turns to Agenda Item 60, which "was regarding 'Expressing the opposition of the Metropolitan Council to House Bill 276 filed in the 2017 Session while under officer involved incident investigations.'" (*Id.*) Defendant asserts that this had nothing to do with police oversight. (*Id.* at 24–25.)

93.    According to Defendant, "six different people appear[ed] in the public comment area for a total of seven times: Ms. Mora[3], Ms. Weaver, unidentified female waving papers, Ms. Epps, Ms. Mora (a second time), Mr. Collins and Ms. Espinoza[4]." (*Id.* at 25.)

---

[3] Mora is not named in Plaintiffs' briefing; however, Defendant does identify her by name. The Court will therefore use her name throughout these findings of fact and conclusions of law.

[4] Espinoza is at times referred to by name and at times unnamed in Plaintiffs' briefing; Defendant does identify her by name. The Court will use her name throughout these findings of fact and conclusions of law.

94.   Defendant contends that only two of those people approached without being "invited to make comments" or in response "to a call by the Mayor Pro tempore for 'anyone wishing to speak on the item'"—"the unidentified female walking around and waving papers" and Plaintiff Collins. (*Id.*) Defendant asserts that "[e]ach approached the area for speaking while the previous speaker was either still speaking or had not cleared the speaking area." (*Id.*) According to Defendant, both Collins and the unidentified woman were removed because they "did not approach the podium area in response to a call for additional public comments" and "appeared while another person was making public comment." (*Id.* at 34.)

95.   Defendant asserts that Collins was removed without having said anything audible. (*Id.* at 29.) He argues that Collins' behavior "violated the procedure utilized for public comments and disturbed the orderly and efficient procedures for the progress of the Metro Council meeting on May 10, 2017." (*Id.* at 33.)

96.   With respect to the other speakers who were removed during the public comment period on Agenda Item 60, Defendant contends that none of them were as a result of the viewpoints they expressed. (*Id.* at 34.)

97.   Instead, Defendant asserts, Ms. Mora was initially allowed to make "her brief comments" before leaving the podium of her own volition (Defendant does not note whether these comments were on-topic). (*Id.* at 30.)

98.   According to Defendant, Ms. Weaver was given warnings for "off-topic comments" including comments on Alton Sterling, and she was ordered removed as soon as Dunnam re-entered the room and was available to remove her. (*Id.* at 30–31.) Defendant contends that "Ms. Weaver could not have been removed or asked to be removed by Scott Wilson earlier than he asked because there were no officers in the room to remove Ms. Weaver

until Dunnam walked back sometime during Ms. Weaver's comments. (*Id.* at 31.) However, the unidentified woman with the papers was removed during Ms. Weaver's comments after she approached "from the audience, walking around in front of the podium where Ms. Weaver [was] standing, waving papers in the air, tossing the papers, and yelling words that cannot be heard or determined." (*Id.*)

99.    Ms. Epps, Defendant argues, was likewise removed for speaking off-topic by calling for the termination of the Baton Rouge Chief of Police. (*Id.* at 31–32.)

100.    At this point, Ms. Mora re-approached the podium and began to speak once more. (*Id.* at 32.) Defendant points out that she did so "even though the Mayor Pro Tempore had not made a call for 'anyone wishing to speak on this item.'" (*Id.* at 32.) However, Defendant states that all Wilson told Ms. Mora when he asked her to sit down at the time was that she had already spoken. (*Id.*) She was then ordered removed from the meeting. (*Id.*)

101.    At this point, Defendant argues, Collins approached the podium "before Ms. Mora is out of sight" to begin speaking. (*Id.*) Defendant argues that "[t]he Mayor Pro Tempore had not asked for or authorized another member of the public to comment[,]" and so Collins was ordered removed. (*Id.* at 32–33.)

102.    Finally, Ms. Espinoza was removed because she called for the termination of officers, which Defendant asserts was off-topic. (*Id.* at 33.)

103.    According to Defendant, Collins was removed for disruptive behavior, not off-topic speech, while Epps, Weaver, and Espinoza were ordered removed for speaking off-topic. (*Id.* at 34.)

104.    Defendant argues that Collins did not, in fact, speak about Alton Sterling. (*Id.* at 35.) He also argues that McClanahan did not mention Alton Sterling until after he was ordered

17

removed, and was in fact ordered removed "after he had mentioned constitutional rights several times and mentioned 'the police department.'" (*Id.*) He argues likewise that Chambers was removed after discussing constitutional rights and did not mention Alton Sterling until after he was ordered removed. (*Id.*)

105.    Defendant argues that each of the Plaintiffs did violate a reasonable restriction on their speech, and therefore no constitutional rights were violated. (*Id.*) He further argues that they have not established *Monell* liability. (*Id.* at 35–36.)

106.    Defendant argues that none of the videos Plaintiffs have introduced to show that the removals were based on "viewpoint discrimination, and to show that the Mayor Pro Tempore treated others differently when they were not talking about Alton Sterling[]" are relevant. (*Id.* at 34–35.)

107.    Defendant first addresses Plaintiffs' video from June 28, 2017, where Arthur Reed[5] was removed after asking ". . . when you're gonna stop pussy footing around and handle the Alton Sterling situation" during an agenda item "regarding the settlement of a claim for damages resulting from an auto accident." (*Id.* at 36.) Defendant argues that "the off topic comment about Alton Sterling (not about settlement of an auto accident claim), coupled with the use of the 'p _ _ _ _ ' word, caused the exclusion; and was a willful disruption of the meeting that date." (*Id.*)

108.    Defendant argues that Mr. Reed was not warned, while McClanahan and Chambers were each warned at least once before they were removed, and so "[t]his is not a valid comparator to show intent." (*Id.*)

---

[5] Despite Arthur Reed being identified by name in Plaintiffs' briefings and at trial, Defendant identifies him only as "the speaker" in his proposed findings of fact & conclusions of law. (*See* Doc. 196 at 36.)

109.    Likewise, Defendant argues that Mr. Lillard[6], who spoke during public comments at a
        meeting on September 23, 2017, is not a valid comparator. (*Id.*) Defendant concedes that
        Mr. Lillard was off-topic and was warned multiple times, but he argues that Lillard
        "heed[ed] the third off topic warning[]" and sat down, which is why he was not removed.
        (*Id.* at 36–37.)

110.    Defendant similarly argues that the public comments by Janice Weber and Dan Weber are
        not valid comparators. (*Id.* at 37.) First, Defendant contends, although Ms. Weber did not
        speak on the agenda item, when she was warned that she was off-topic, she "responded
        'Okay' and then asked a question on topic[.]" (*Id.*) Second, Defendant argues, although Mr.
        Weber likewise began speaking off-topic, he left the podium after being told that he was
        off-topic. (*Id.*)

111.    Defendant next turns to the public comments of community member Dan Ortega at a Metro
        Council meeting on August 23, 2017, where Mr. Ortega was twice warned by the Mayor
        Pro Tempore to stay on topic. (*Id.* at 37–38.) Despite this, Defendant maintains, "it does
        appear Mr. Ortega was taking [sic] about the [agenda item] although perhaps inartfully."
        (*Id.* at 38.) Defendant argues that Mr. Ortega "heeded the Mayor Pro Tempore's second
        warning[.]" (*Id.*)

112.    With respect to community member Russell Kelly's public comments at the same meeting
        on August 23, 2017, Defendant argues that although he was twice warned to stay on-topic,
        he "did not need and was not given a third warning like Mr. McClanahan was because he
        sat down and did not continue talking." (*Id.* at 38–39.) Mr. Kelly was "talking about the
        efficiency of this Council" and team training during an agenda item "expressing the support

---

[6] Defendant refers to Lillard as Villard. The Court will refer to him as Lillard, which is how he is referred to in the
video exhibit. (Pl. Ex. 23 at 00:24–00:26.)

of the Metropolitan Council for the investigation by the Louisiana Department of Justice into the July 5, 2016 shooting of Alton Sterling, to be conducted as expeditiously as possible." (*Id.* at 38.)

113.    Defendant also notes that Plaintiff Chambers was allowed to discuss Alton Sterling and the police during the same agenda item. (*Id.* at 39.) He argues that this shows that Chambers was allowed to discuss Alton Sterling and the police when they "were on topic for an agenda item[.]" (*Id.*)

114.    Finally, Defendant argues that community member Jim Mora's public comments on "the extension of the City of Baton Rouge to include areas surrounding Our Lady of the Lake Hospital and the Mall of Louisiana[,]" during which Mr. Mora read from a Dr. Seuss book for over two minutes, are "[n]ot a valid comparator due to the uniqueness of the situation and the three year difference." (*Id.*) Defendant does not explain what made the situation unique. (*See id.*)

115.    Defendant argues that these are not comparators that can serve to show intent because they are not "sufficiently similar nor do they establish a widespread pattern of any particular conduct so as to constitute custom." (*Id.* at 39.) Defendant asserts that they cannot be used to show a pattern or policy under *Monell* because they are not "prior acts of the Mayor Pro Tempore[.]" (*Id.* at 39–40.) Defendant therefore asks that all these comparator exhibits be excluded except the video clip showing that Plaintiff Chambers was "not prohibited from making public comments about Alton Sterling, the police, or the police officer who shot Alton Sterling when those items were 'on topic' to the agenda item being considered." (*Id.* at 40.)

116.    Defendant also seeks to include a clip in which Plaintiff Chambers is warned three times that he is off-topic and is then requested to sit down, which he does. (*Id.*)

117.    Defendant argues that the Mayor Pro Tempore is not the final decisionmaker for whether an individual "should be removed during the public comment period." (*Id.* at 41.) He contends that Dunnam testified that "council members could act to override the Mayor Pro Tempore's decision to enforce a time limit policy." (*Id.*)

118.    He also argues that Dunnam's testimony does not "establish that the Mayor Pro Tempore is a policy maker as the policies applied are those established by law, the Plan of Government, the Code of Ordinances, or the Open Meetings Law[,] . . . and by procedures or polices adopted by the Metro Council, such as the use of comment cards, time limits for speaking, or when public commenters are allowed to approach for public comment." (*Id.*)

119.    Defendant argues that Plaintiffs' social media activity prior to the May 10, 2017, Metro Council Meeting is relevant and should be included in evidence. (*Id.*) He asserts this is "[e]vidence of prior extrinsic acts . . . to establish that a party acted with intent[.]" (*Id.* at 42.) According to Defendant, this shows that Plaintiffs' actions "were willfully disruptive." (*Id.*)

120.    Defendant further argues in a single three-sentence paragraph that Plaintiffs have not alleged a prior restraint claim. (*Id.*)

121.    Defendant contends that although the Metro Council meeting qualifies as a limited public forum, the government can restrict speech in such a forum so long as it does not engage in viewpoint discrimination and the regulations are reasonable. (*Id.* at 45.)

122.  According to Defendant, a viewpoint discrimination claim requires a showing of discriminatory intent in violation of the First Amendment, which cannot be shown if Plaintiffs violated a reasonable restriction—which Defendant asserts they each did. (*Id.*)

123.  Defendant argues that because Wilson (now replaced by LaMont Cole) "is sued in his official capacity as Mayor Pro Tempore of the City of Baton Rouge, Parish of East Baton Rouge," this suit is "equivalent to, redundant to and the same as suing the entity itself, City of Baton Rouge/Parish of East Baton Rouge." (*Id.* at 46.)

124.  Defendant maintains that Plaintiffs cannot show *Monell* liability. (*Id.* at 46–47.) He asserts that they "have not identified an express policy that led to the alleged deprivation of their First Amendment constitutional rights, or an express policy of shutting down black people and allowing white people to talk[.]" (*Id.* at 47.) According to Defendant, Plaintiffs' failure to show "written policies" or custom other than the Metro Council's adherence to the Open Meetings Law dooms their *Monell* claim. (*Id.*)

125.  Accordingly, Defendant asks that the Court render judgment in his favor. (*Id.*)

## V.  DISCUSSION

### A.  *Facts*

126.  The Court notes that the parties do not largely disagree on what happened on May 10, 2017; they do, however, disagree on the intent and meaning of those events.

127.  The Court finds, therefore, that on May 10, 2017, the Baton Rouge Metro Council held a Metro Council Meeting, at which Scott Wilson was presiding as Mayor Pro Tempore and chairman of the council.

128.    Plaintiffs McClanahan, Chambers, and Collins attended this meeting. Over the course of the meeting, all three intended and attempted to speak about their displeasure with the Metro Council's inaction following the killing of Alton Sterling.

129.    Plaintiffs McClanahan and Chambers had participating in organizing for this purpose prior to the meeting. (*See* Def. Ex. 11, 13, 14, 15, 17, 18, 19, 22, 25, 31, 39.) Only one of these is attributable to Plaintiff McClanahan: a post on the NAACP Baton Rouge Branch Facebook page from May 10, 2017, which called for "NAACP members to wear black and pack the courthouse today at 3:00pm. Tell your family and friends to come out in solidarity to demand the Mayor fire the Police Chief and the two officers for the murder of Alton Sterling. In the absence of justice, there should be no peace!" (Def. Ex. 25.)

130.    On May 10, 2017, Dunnam sent Wilson a screenshot of a post made by Chambers on his Facebook page. (Doc. 194 at 156–57; *see* Def. Ex. 46.)

131.    After viewing the social media posts made by Plaintiff Chambers, Wilson and Dunnam arranged for extra security at the meeting. (Doc. 194 at 158–60.)

132.    Although the normal procedure was to have members of the public fill out comment cards prior to speaking on agenda items at Metro Council meetings, Defendant admits that this process was not followed on May 10, 2017. (*See* Def. Ex. 6 (stating the general Public Comment Policy); Doc. 201 at 23 (Defendant arguing that "the evidence is overwhelming that public comment cards [were] not used on May 10, 2017").)

133.    Instead, Wilson invited public comment on each agenda item. Community members were permitted to approach the podium following calls for public comment on an agenda item. (Doc. 201 at 55.)

134. At no point were community members informed that they must wait for the call for public comment to be repeated after each individual spoke.

135. Likewise, community members were not informed that they had to explain their comment's relevance to the agenda item at hand within a certain number of sentences, or seconds, of their three-minute allotment.

136. Although community members were told that they would be removed if they disrupted the meeting, (Def. Ex. 1 at 2:18–2:32), they were not informed that the failure to explain how their comments were relevant to the agenda item at hand within some number of sentences or seconds would be considered off-topic and therefore willfully disruptive.

137. Whether public comments were perceived to be "on-topic" or were subject to warnings and removal varied during the May 10, 2017, Metro Council meeting.

138. On May 10, 2017, McClanahan participated in public comment on Agenda Item 50. (Doc. 194 at 18–19.) He began by introducing himself, then said "I'm speaking against the proposed item on the agenda today as a citizen of this community. I believe—" at which point he was interrupted by Wilson. (Def. Ex. 2 at 00:35–00:42.) When McClanahan stated, "I oppose the sewer item because on July the 5th, 2016, Alton Sterling was killed[,]" Wilson immediately ordered him removed. (*Id.* at 01:14–01:20.)

139. McClanahan attempted to explain that he was opposed to the City spending money on this item because, in his opinion, "the City had not finished taking care of the business as it pertained to Alton Sterling." (Doc. 194 at 23.)

140. However, McClanahan was not able to finish his comment at the meeting on May 10, 2017. (*Id.* at 24.) When McClanahan said the words Alton Sterling, he was removed from the

podium and from the room at Defendant Wilson's instruction. (*Id.*; Def. Ex. 2 at 01:14–01:20.)

141.    Plaintiff Chambers, likewise, participated in public comment on May 10, 2017. (Doc. 194 at 26.) He approached the podium in opposition to Agenda Item 51 and began by saying, "[s]o you guys are gonna rob me of my constitutional rights to say what I believe needs to be said . . ." at which point Wilson interrupted him to tell Chambers to speak on-topic. (Def. Ex. 3 at 00:18–00:24.)

142.    At trial, Chambers stated that he opposed this item because, in his opinion, "the city of Baton Rouge needed to deal with the issue of Alton Sterling's civil suit." (Doc. 194 at 28.) He believed that "the Metro Council had an obligation to ensure that the cops who killed a man were held accountable instead of talking about sewer lines[.]" (*Id.* at 73.)

143.    Chambers, like McClanahan, was not able to finish his comment at the meeting on May 10, 2017, because he was removed from the podium and from the room at Defendant Wilson's instruction. (*Id.* at 28–29; Def. Ex. 3 at 00:25–01:05.)

144.    Dunnam then arrested Chambers. (*Id.* at 29.)

145.    Collins too attempted to speak during public comments at the May 10, 2017, Metro Council Meeting. (*Id.* at 93.) He attempted to speak during public comment on Agenda Item 60, which "express[ed] the opposition of the Metropolitan Council to House Bill 276 filed in the 2017 Session while under officer involved incident investigations." (Doc. 110 at 7.) Collins believed this item "was definitely in total context around police violence and police violence against the community." (Doc. 194 at 93.) Collins intended to "draw attention to how this would purposefully hurt the efforts that we just saw with the killing of Mr. Alton Sterling[.]" (*Id.*)

146.  Collins approached the microphone during the public comment session on this agenda item, which Wilson initiated by saying "this is a public hearing, anyone wishing to speak on the item?" (Def. Ex. 5 at 00:17–00:20.)  Like at least one other speaker at the May 10, 2017, Metro Council Meeting, Collins approached the microphone after this first call for public comments but without another intervening call between him and the preceding speaker. (*Id.* at 04:24–04:27, 04:41–04:46.)

147.  Although the microphone was not turned on when Collins began to speak, he can be heard to say, "I oppose this motion because on July . . ." (*Id.* at 04:27–04:31.)

148.  Wilson ordered Collins removed not when he first approached the podium but when he said the words ". . . on July . . ." (*Id.* at 04:27–04:36.)

149.  Wilson did not ask Collins to wait until further comment was invited or ask him to sit down. (*Id.* at 04:29–04:36.) Instead, he ordered Collins immediately removed. (*Id.*) Collins was escorted from the room. (*Id.*)

150.  The speaker after Collins, Lynne Espinoza, also approached the podium without waiting for Wilson to invite further comment. (*Id.* at 04:41–04:46.) She was permitted to speak— until she brought up the police officers involved in Alton Sterling's killing, at which point she too was removed. (*Id.* at 04:44–05:25.)

151.  In addition to Ms. Espinoza and Plaintiffs, Wilson ordered that Coby Weaver be removed from the podium and from the meeting on May 10, 2017. (Def. Ex. 5 at 03:01–03:08.) Ms. Weaver criticized the police and brought up Alton Sterling. (*Id.* at 01:26–01:30, 01:57– 02:01, 02:06–02:10.) When Ms. Weaver brought up Alton Sterling, Wilson interrupted her to say, "We're not talking about Alton Sterling." (*Id.* at 02:01–02:02.)

152. Wilson also ordered that Sydney Epps be removed from the podium and the meeting when she brought up Alton Sterling. (*Id.* at 03:32–04:10.)

153. Finally, Wilson ordered that two other community members be removed—one who walked in between the podium and the Metro Council members while Ms. Weaver was speaking and shouted over Ms. Weaver, (Def. Ex. 5 at 02:35–02:47), and another who attempted to speak twice on the same agenda item, (*id.* at 04:11–04:21).

154. The Court finds that at the May 10, 2017, Metro Council meeting, the Mayor Pro Tempore ordered the removal of Plaintiffs and other community members for speaking about Alton Sterling's killing. He did so without allowing these community members the opportunity to explain how their comments pertained to the agenda item at hand.

**B.    *Standard***

**1.    *Monell* Liability**

155. Under § 1983, municipal liability requires (1) a policymaker; (2) an official policy; and (3) "a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

156. Fifth Circuit "caselaw establishes three ways of establishing a municipal policy for the purposes of Monell liability." *Webb v. Town of St. Joseph*, 925 F.3d 209, 214 (5th Cir. 2019).

157. "First, a plaintiff can show 'written policy statements, ordinances, or regulations.'" *Id.* at 214–15 (quoting *Alvarez v. City of Brownsville*, 904 F.3d 382, 389–90 (5th Cir. 2018)).

158. "Second, a plaintiff can show 'a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Id.* at 215 (quoting *Alvarez*, 904 F.3d at 390).

159.  "Third, even a single decision may constitute municipal policy in 'rare circumstances' when the official or entity possessing 'final policymaking authority' for an action 'performs the specific act that forms the basis of the § 1983 claim.'" *Id.* (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017)).

### 2.    The First Amendment

160.  "'The scope of [a plaintiff's] first amendment rights depends on the nature of the forum to which he seeks access.'" *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 340 (M.D. La. 2022) (deGravelles, J.) (quoting *Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989)).

161.  "The nature of forum impacts the level of scrutiny applied to restrictions on protected speech occurring within that forum." *Mejia v. Lafayette Consol. Gov't*, 2025 WL 890525, at *5 (W.D. La. Mar. 20, 2025).

162.  "There are three categories of forums . . . : (1) traditional and designated public forums; (2) limited public forums; and (3) nonpublic forums." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757–58 (5th Cir. 2010) (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344–45 (5th Cir. 2001) (per curiam)).

163.  "Traditional public forums include sidewalks, streets, and parks that the public since time immemorial has used for assembly and general communication." *Id.*

164.  "In traditional public fora—sidewalks, streets, and parks—the government has little regulatory leeway: content- or viewpoint-based restrictions are strictly scrutinized." *Little v. Llano Cnty.*, 138 F.4th 834, 858 (5th Cir. 2025) (citing *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020) (citing *Fairchild*, 597 F.3d at 758)).

165.  "The state can also intentionally create 'designated' public forums on other state property for the same widespread use as traditional public forums." *Fairchild*, 597 F.3d at 758.

166.  "Regulation of speech in traditional or designated public forums must pass strict scrutiny with a compelling state interest and narrow tailoring." *Id.*

167.  On the other hand, "[t]he government has more latitude in 'limited' public fora, which are 'places that the government has opened for public expression of particular kinds or by particular groups.'" *Little*, 138 F.4th at 859 (quoting *Freedom From Religion Found.*, 955 F.3d at 426 (citing *Chiu*, 260 F.3d at 346)).

168.  While a public body may impose restrictions on speech in a limited public forum, those restrictions are only valid "if they are '(1) reasonable in light of the purpose served by the forum and (2) do[] not discriminate against speech on the basis of viewpoint.'" *Id.* (quoting *Freedom From Religion Found.*, 955 F.3d at 426–27).

169.  "Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Mejia*, 2025 WL 890525, at *5 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995)).

170.  However, a public body may still "impose reasonable viewpoint-neutral rules on speech in a limited public forum[,]" including "restrict[ing] the subject matter of speech in a limited public forum by, for example, limiting public comments during a meeting of the public body to agenda items or specific topics." *Id.* (citing *McCullen v. Coakley*, 573 U.S. 464, 477 (2014); *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021)).

*C.*  *Analysis*

171.  The Court now resolves the following factual and legal issues raised in this case:

*A.* Have Plaintiffs established a final policymaker and official policy for the purpose of *Monell* liability?

*B.* Have Plaintiffs shown by a preponderance of the evidence that their removal from the podium violated their First Amendment rights? That is, have Plaintiffs shown:

  i.  that they were not violating reasonable restrictions on their speech; and

  ii. that Wilson acted with improper motive?

*C.* Have Plaintiffs shown by a preponderance of the evidence that their removal from the Metro Council meeting room violated a separate First Amendment right to remain in the chamber?

*D.* Have Plaintiffs shown by a preponderance of the evidence that Collins' removal from the podium constituted a violation of the doctrine of prior restraint?

*E.* Have Plaintiffs shown by a preponderance of the evidence that Wilson engaged in racial discrimination in violation of their Fourteenth Amendment rights?

**1.      Have Plaintiffs established a final policymaker and official policy for the purpose of *Monell* liability?**

172.    Plaintiffs argue that they have shown municipal liability under the theory that Defendant Wilson was a final policymaker whose decision to remove Plaintiffs from the Metro Council meeting established a constitutional violation under § 1983. (Doc. 198-1 at ¶¶ 123–28.)

173.    Defendants, on the other hand, argue that Wilson was not a final policymaker. (Doc. 196 at 41.)

174. At trial, Dunnam stated that Wilson was, in fact, the final decisionmaker as to whether an individual should be removed from a Metro Council meeting during public comment. (Doc. 194 at 173–74.)

175. According to the Code of Ordinances of the City of Baton Rouge, Louisiana and East Baton Rouge Parish, Louisiana, the Mayor-President or President Pro-Tempore generally acts as chairman of the council. Baton Rouge, La. Mun. Code § 1:3 (2016).

176. The chairman allocates time for public comment, and members of the public may speak only with his permission. *Id.* at § 1:7(a).

177. "The ruling of the chair on [a] procedural point shall be final." *Id.* at § 1:8.

178. While Wilson may not have been a final policymaker for any citywide policies being determined at the Metro Council meetings, he was, as chairman, the final decisionmaker as to all procedural points at the Metro Council. § 1:8. He also was the final decisionmaker as to whether to allow members of the public to speak. § 1:7(a).

179. The Court concludes, therefore, that Wilson, as Mayor Pro Tempore, was the final policy- and decisionmaker with respect to allowing and removing speakers from public comment at the Metro Council meetings during his tenure.

180. Next, the Court asks whether Plaintiffs have shown "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy[,]" *Alvarez*, 904 F.3d at 390, or "even a single decision" wherein Wilson performed the specific act that forms the basis for this § 1983 claim. *See Webb*, 925 F.3d at 214–215.

181. Wilson ordered each of the Plaintiffs removed from at minimum the podium. (Def. Ex. 2 at 01:14–01:20; Def. Ex. 3 at 00:26–01:05; Def. Ex. 5 at 04:27–04:36.)

182.    He also ordered multiple other community members who discussed Alton Sterling or the police removed from the podium at Metro Council meetings on May 10, 2017, and June 28, 2017. However, during an agenda item specifically about Alton Sterling's killing on August 23, 2017, Wilson did not order Plaintiff Chambers removed for speaking about Alton Sterling. (Pl. Ex. 26 at 4:11–7:13.)

183.    Defendant argues that this is not enough to show a widespread practice constituting municipal policy.

184.    Even accepting that argument, the specific act of ordering each of the Plaintiffs removed during the public comment period is enough to fall under the third way that a plaintiff may establish municipal liability for the purposes of *Monell*—"when the official or entity possessing 'final policymaking authority' for an action 'performs the specific act that forms the basis of the § 1983 claim.'" *Webb*, 925 F.3d at 215 (quoting *Davidson*, 848 F.3d at 395). *See also Imani*, 614 F. Supp. 3d at 364 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 484–85 (1986) (finding that court of appeals erred in dismissing petitioner's claim against a county when the prosecutor, the relevant final policymaker, "made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic," and "[t]hat decision directly caused the violation of petitioner's Fourth Amendment rights.")).

185.    Since Plaintiffs have established *Monell* liability, the question before the Court is now whether they have shown that their rights were in fact violated.

186.    The Court will now proceed to the question of whether Plaintiffs have shown the last element required to establish *Monell* liability, a violation of a right as a result of the policymaker's single policy decision. In other words, have Plaintiffs succeeded in showing

that Wilson's actions resulted in either a violation of their First or Fourteenth Amendment claims?

187. Because these questions are at the core of this action, the Court addresses them separately.

> **2.    Have Plaintiffs shown by a preponderance of the evidence that their removal from the podium violated their First Amendment rights?**

188. The Fifth Circuit has previously described local government meetings, "in which 'the State is not required to and does not allow persons to engage in every type of speech[,]'" as "fit[ting] the hornbook definition of a limited—not designated—public forum[.]" *Fairchild*, 597 F.3d at 759.

189. Relevant to its analysis of a school board as a limited public forum in *Fairchild*, the Fifth Circuit pointed to the Board's decision to "open[] its meetings for a short duration to hear comments relevant to this part of its agenda." *Id.*

190. As the Eastern District summarized, "[a] city council meeting is *generally* recognized to be a 'limited public forum,' which means that the government does not have to allow persons to engage in every type of speech." *Heaney v. Roberts*, 147 F. Supp. 3d 600, 605 (E.D. La. 2015) (citing *Fairchild*, 597 F.3d at 759 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001))).

191. "Therefore, consistent with the First Amendment, the governing body may restrict speakers to the subject at hand, impose time limits on speakers, and prevent disruptions of the meeting." *Id.* (citing *Wenthold v. City of Farmers Branch*, No. 11-748, 2012 WL 467325, at *8 (N.D. Tex. Feb. 14, 2012)).

192. The parties agree that the Metro Council meeting is a limited public forum. (Doc. 196 at 45; Doc. 198-1 at ¶ 139.)

33

193.   In addition, Plaintiffs do not challenge the Baton Rouge Code of Ordinances or the Louisiana Open Meetings Law on their face; instead, they "are raising an *as-applied* challenge, because government agents may only enforce topic rules in a manner 'consistent with the First Amendment.'" (Doc. 198-1 at ¶ 146 (quoting *Heaney I*, 147 F. Supp. 3d at 605).) Plaintiffs are not, therefore, challenging whether these restrictions are facially constitutional.

194.   Instead, the parties disagree as to whether Wilson's actual removal of Plaintiffs from the meeting fit within the constraints of the First Amendment.

195.   The Fifth Circuit emphasized that where a public body has "a limited public forum, its policies must be both viewpoint-neutral and reasonable in light of the forum's purpose." *Fairchild*, 597 F.3d at 759.

196.   "The government cannot under any circumstances, however, restrict speech based on viewpoint, and even viewpoint-neutral restrictions must be reasonable in light of the forum's purpose." *Heaney I*, 147 F. Supp. 3d at 605 (citing *Fairchild*, 597 F.3d at 760).

197.   "It is beyond debate that the law prohibits viewpoint discrimination in a limited public forum." *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017) [hereinafter "*Heaney II*"] (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001)).

198.   "[V]iewpoint discrimination violates the First Amendment regardless of the forum's classification." *Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992) (citing *Cornelius*, 473 U.S. at 806, 812).

199.   Where a speaker is "speaking on an approved topic and within his allotted time[,]" he is not violating a reasonable restriction. *Heaney II*, 846 F.3d at 802.

200.   Where a speaker is "not silenced for violating a reasonable restriction, the First Amendment claim turns on [the public official]'s motive or intent in silencing and ejecting [the speaker] from the meeting." *Id.*

201.   "'No violation occurs when the same result would have occurred in the absence of any illegitimate motive.'" *Id.* (quoting *Lowery v. Jefferson Cty. Bd. of Educ.*, 586 F.3d 427, 435 (6th Cir. 2009)).

202.   Whether the public official "acted on an improper motive [] is a factual dispute[.]" *Id.*

203.   If the public official did "act[] with improper motive, he violated [the speaker]'s clearly established First Amendment right to be free from viewpoint discrimination in a limited public forum." *Id.*

> i.     *Have Plaintiffs shown that they were not violating reasonable restrictions on their speech?*

204.   Here, Defendant characterizes the Plaintiffs as violating reasonable restrictions, (Doc. 196 at 45), while Plaintiffs allege that Wilson engaged in viewpoint discrimination, (Doc. 198-1 at ¶ 129).

205.   Defendant argues that Wilson was justified in removing McClanahan, Chambers, and Wilson because their comments were disruptive, which Defendant asserts violates the Louisiana Open Meetings Law. (Doc. 201 at 1–4.) According to Defendant, the Louisiana Attorney General has stated that "a person or persons, even an appointed or elected official, who willfully disrupt a meeting to the extent that orderly conduct of the meeting is seriously compromised may be removed, by lawful force if necessary." (*Id.* at 57 (citing La. Atty. Gen. Op. No. 91-19, 1991 WL 575273).)

206.    Defendant has not provided any caselaw or authorities to the Court on what constitutes a willful disruption, orderly conduct, or serious compromising of that conduct.

207.    However, Louisiana appellate courts have provided some guidance. For example, the Louisiana First Circuit upheld a trial court's injunction preventing an individual with a history of "erratic and threatening behavior[]" toward his former employer and of carrying firearms into public meetings from attending public meetings held by that former employer, finding the restriction to be "reasonable and view-point neutral in light of the facts of this case." *Ortega v. Rec. & Parks Comm'n*, 2017-1502 (La. App. 1 Cir 07/18/18), 255 So. 3d 6, 14. Likewise, because the former employer had "a reasonable basis to believe that [the plaintiff's] presence at any of its facilities could be potentially harmful to the general public[,]" and because the plaintiff could petition "to have the restriction lifted or modified in accordance with the circumstances[]" at any time in the future, the appellate court found that the "restriction on [the plaintiff] does not violate Louisiana's Open Meetings Law[.]" *Id.* at 16.

208.    In that instance, then, willful disruption that threatened to seriously compromise the orderly conduct of the meetings required threats of violence and erratic behavior. *Id.*

209.    Likewise, in *Rushing v. Southeastern Louisiana University*, the Louisiana First Circuit upheld a lower court's determination that the university's Faculty Senate had not violated the plaintiff's rights when it removed him from the Faculty Senate meeting. *Rushing v. Se. La. Univ.*, 2022-0032 (La. App. 1 Cir. 09/16/2022), 2022 WWL 4286824, at *3, 8. Its decision was based on testimony from multiple people that "reflected increasing concern" because of the plaintiff's behavior, including testimony that the plaintiff once "was 'on the

cusp' of being 'physically belligerent[,]'" all of which eventually led to him being removed from a meeting. *Id.* at *6–7.

210.    Again, removal for willful disruption was based on erratic and threatening behavior that led to "chaos" and made individuals at the meeting fear for their safety. *Id.* at 6.

211.    Defendant argues in his post-trial brief that McClanahan and Chambers were "talking off topic[,]" that "Collins created bedlam in the Council Chambers, as did an unidentified female before him, when he violated the policy of not approaching to make public comments until a call is made for 'anyone wishing to comment on this item' and by doing so before the prior speaker had been completely out of the area.'" (Doc. 196 at 45.)

*a.    Plaintiff Collins*

212.    First, the Court cannot accept the contention that Plaintiff Collins "created bedlam" by approaching the podium calmly, with a paper in his hand, to speak during a public comment period. (*See id.*; *see* Def. Ex. 5 at 4:24–4:30.) Defendant's argument that Collins "violated the policy of not approaching to make public comments until a call is made for 'anyone wishing to comment on this item[,]'" (Doc. 196 at 45), is undermined first by Defendant's failure to produce any evidence that such a policy existed, second by video evidence that at least one other speaker was *not* removed for the exact same behavior, and third by video evidence that Collins was not removed until he said the word "July," (Def. Ex. 5 at 4:27–4:36).

213.    While Defendant argues that "there is no evidence that Eugene Collins talked about Alton Sterling. All we know is that he said '[o]n' while at the podium[,]" (Doc. 201 at 6), this is not all the Court knows. Defendant himself submitted a video exhibit containing a clip of the interaction in question. (Def. Ex. 5.) Although the microphone was not turned on,

Collins can be heard to say, "I oppose this motion because on July . . ." (*Id.* at 4:27–4:31.) It was at this point, not upon Collins' approaching the microphone, that Wilson ordered Collins immediately removed. (*Id.* at 4:27–4:36.)

214. Wilson did not ask Collins to wait until further comment was invited or ask him to sit down. He ordered him removed, and Collins was escorted from the room. (*Id.*)

215. In contrast, Ms. Espinoza then approached, again without Wilson inviting further comment. (Def. Ex. 5 at 04:41–04:46.) Unlike Collins, she was permitted to speak—until she brought up the police officers involved in Alton Sterling's killing, at which point she too was removed. (*Id.* at 04:44–05:25.)

216. It is clear, then, that the reason given for Collins' removal—the alleged "bedlam" created by his approaching the podium without Wilson reiterating his call for public comment—was not cause to remove other community members. Furthermore, the trial record does not reflect that the requirement to wait for the call to be repeated between each public commenter was ever stated.

217. Collins did not violate any stated requirement. He did not create bedlam. He was removed when he said the word "July," which at that point in the meeting, Wilson clearly understood as a reference to Alton Sterling's death.

218. Collins attempted to speak during the public comment period on an agenda item that he saw as directly related to the death of Alton Sterling. (Doc. 194 at 93–94.) He was not given any opportunity to explain how his comments related to the agenda item at hand. (Def. Ex. 5 at 4:27–36.) He was instead removed before he finished a single sentence, as soon as he referenced the date of Alton Sterling's killing. (*Id.*)

219.    Collins was not, at the time of the May 10, 2017, Metro Council meeting, involved in the leadership of NAACP, nor is there any evidence that he was involved in any of the other organizations that planned to protest at the meeting. He stated at trial that "[a]t that time I don't even believe I was an active member of the NAACP, so I was probably there on my own accord." (Doc. 194 at 110.) There is no evidence that Collins had previously been removed from any prior Metro Council meetings, that he posed any type of threat, or that the Metro Council had any reason to believe he might be disruptive.

220.    The Court cannot find that Collins' approach to the podium during the public comment period, in the same manner that other community members approached the podium during the public comment period, was a willful disruption of the meeting warranting removal.

221.    Nor does the Court find that anyone could reasonably believe Collins was off-topic in the seven words he was permitted to say, five of which were "I oppose this motion because[.]" (Def. Ex. 5 at 4:27–4:31.)

222.    Collins' removal does not fall under the type of restrictions broadly permitted in a limited public forum consistent with the First Amendment. *See Mejia*, 2025 WL 890525, at *5 (citing *McCullen*, 573 U.S. at 477; *Ison*, 3 F.4th at 893 (6th Cir. 2021)); *Heaney I*, 147 F. Supp. at 605.

### b.  Plaintiff McClanahan

223.    Next, the Court looks at the removal of Plaintiff McClanahan.

224.    McClanahan began his comments by saying good afternoon to the council, then introducing himself. (Def. Ex. 2 at 00:25–00:35.) He then stated "I'm speaking against the proposed item on the agenda today as a citizen of this community. I believe—" at which point he was interrupted by Wilson. (*Id.* at 00:35–00:42.) Wilson did not, at that point, tell

McClanahan to stay on topic. Instead, he asked, "Speaking on what?" and said that Item 50 was about a sewer backup. (*Id.* at 00:44–00:52.)

225.    McClanahan said "I'm going to tell you why I oppose that. You all haven't heard anything yet. You can't just oppose something you haven't heard. Give me an opportunity to speak, and you can rebut, right? That's how it works, I think?" (*Id.* at 00:52–01:02.) Wilson, again, did not warn McClanahan to stay on topic but said "No, not really." (*Id.* at 01:02–01:03.) McClanahan replied, "Well, it should work like that[,]" and continued to speak, only to be interrupted again by Wilson, who said "I'm not going to warn you about it. You can either talk on the item or you can leave." (*Id.* at 01:04–01:10.)

226.    When McClanahan stated, "I oppose the sewer item because on July the 5th, 2016, Alton Sterling was killed[,]" Wilson immediately ordered him removed. (*Id.* at 01:14–01:20.)

227.    Plaintiff McClanahan was not permitted to explain the connection he saw between his public comment and the agenda item at hand. According to McClanahan, he was opposed to the agenda item, and the disbursement of settlement funds, because it represented the Metro Council's policy of continuing with business as usual rather than addressing Alton Sterling's killing. (Doc. 194 at 135.) He was prevented from explaining this view.

228.    Wilson interrupted McClanahan as soon as McClanahan moved beyond preliminary introductions. (Def. Ex. 2 at 00:41–00:44.) When, after interrupting McClanahan multiple times, Wilson told him to speak on the agenda item, McClanahan began to say why he opposed the agenda item, only for Wilson to order him removed. (*Id.* at 00:41–01:21.)

229.    McClanahan was removed for being off-topic, according to Defendant. McClanahan began by saying that he opposed the agenda item and attempted to explain why he did so, but he

was not given the opportunity to speak on the topic of the agenda item before he was removed.

230.    McClanahan was, at the time, the president of the Baton Rouge chapter of the NAACP. (Doc. 194 at 128–29.) The NAACP had engaged in organizing in advance of the meeting. (Def. Ex. 25.) However, there is no evidence that this organizing was intended to be in any way disruptive. (*See id.*) Instead, it simply called for "NAACP members to wear black and pack the courthouse today at 3:00pm. . . in solidarity to demand the Mayor fire the Police Chief and the two officers for the murder off Alton Sterling." (*Id.*) It called for no specific actions other than (a) wearing black and (b) attending the Metro Council meeting. (*Id.*)

231.    The Court cannot accept that merely encouraging others to attend the Metro Council meeting while wearing a specific color is in any way disruptive.

232.    Nor is there any evidence that Wilson knew prior to the meeting that McClanahan had posted anything whatsoever.

233.    Nor indeed is there any evidence that McClanahan was, at the time, attempting to do anything other than speak during the allotted public comment period as any other member of the public might speak. There is no evidence that McClanahan had previously been removed from any prior Metro Council meetings, that he posed any type of threat, or that the Metro Council had any reason to believe he might be disruptive.

234.    As with Collins, then, the Court finds that McClanahan's removal does not fall under the type of restrictions broadly permitted in a limited public forum consistent with the First Amendment. *See Mejia*, 2025 WL 890525, at *5 (citing *McCullen*, 573 U.S. at 477; *Ison*, 3 F.4th at 893 (6th Cir. 2021)); *Heaney I*, 147 F. Supp. at 605.

*c.   Plaintiff Chambers*

41

235.    The Court now turns to Plaintiff Chambers.

236.    When Chambers began his public comments on Item 51, he said only "[s]o you guys are gonna rob me of my constitutional rights to say what I believe needs to be said[.]" (Def. Ex. 3 at 00:18–00:25.) This statement had nothing to do with the agenda item at hand. He did not oppose the agenda item nor attempt to do so.

237.    When Wilson interrupted Chambers to tell him to "speak on the item or you can leave[,]" Chambers did not attempt to explain how his comments were connected to the agenda item at hand. (*Id.* at 00:23–00:25.)

238.    Instead, he continued ". . . and have the police department . . ." at which point Wilson ordered him removed. (*Id*. at 00:25–30.) Chambers continued "who you pay for to escort the tax-paying citizens of this community out. I'm not going to let him—I have three minutes on the clock." (*Id.* at 00:26–00:34.) Wilson again interrupted Chambers, saying "No, but not on this item." (*Id.* at 00:33–00:35.)

239.    It was at this point that Chambers explicitly brought up Alton Sterling, saying "[a]gain I say, Alton Sterling was murdered on July the fifth." (*Id.* at 00:35–00:38.) Wilson's initial order for Chambers' removal came as soon as he criticized the police department. (*Id.* at 00:25–00:28.) His next order for Chambers' removal came when Chambers brought up Alton Sterling's killing. (*Id.* at 00:37–00:42.)

240.    While Chambers, like Collins and McClanahan, was interrupted within seconds of beginning his public comments, he made no attempt at any point to speak on the agenda item at hand nor to tie his comments to the agenda item at hand.

241.    In addition, Chambers had posted extensively on social media prior to the Metro Council meeting about plans to "shut down" the meeting. (*See* Def. Ex. 11, 13, 14, 15, 17, 18, 19,

22, 31, 39.) Wilson was aware of at least one of these social media posts, which had prompted Wilson and Dunnam to arrange extra security. (Doc. 194 at 158–60.)

242. Furthermore, Dunnam testified that Chambers had been disruptive at Metro Council meetings in the past. (Doc. 194 at 160–161.)

243. In light of the totality of these circumstances and the extremely unique facts of the case—including Chambers' history of disruptive behavior, his social media posts planning to "shut down" that specific meeting, and his lack of any attempt to tie his comments to the agenda item at hand—Chambers has not shown by a preponderance of the evidence that he was not violating the reasonable restrictions put in place. Instead, Wilson's order to remove Chambers falls under the type of restrictions broadly permitted in a limited public forum consistent with the First Amendment. *See Mejia*, 2025 WL 890525, at *5 (citing *McCullen*, 573 U.S. at 477; *Ison*, 3 F.4th at 893 (6th Cir. 2021)); *Heaney I*, 147 F. Supp. at 605.

244. However, with respect to both Collins and McClanahan, Plaintiffs have shown by a preponderance of the evidence that they were not violating any reasonable restriction. The Court cannot find that a statement of opposition to an agenda item on the basis that the agenda item represents a policy that the speaker opposes, without the opportunity to explain that opposition, is a willful disruption of the orderly conduct of a meeting warranting the speaker's removal.

        *ii.      Have Plaintiffs shown that Wilson was acting with improper motive?*

245. Plaintiff Collins' and McClanahan's First Amendment claims now turn on Wilson's "motive or intent in silencing and ejecting [the speakers] from the meeting." *Heaney II*, 846 F.3d at 802.

43

246. In order to determine Wilson's intent, the Court compares how speakers who discussed Alton Sterling and the police were treated as opposed to those speakers who discussed other topics.

247. As the Court found in the findings of fact, the record reflects that at the May 10, 2017, Metro Council meeting, Wilson ordered the removal of every speaker who mentioned Alton Sterling, the date of his killing, or criticized the police, regardless of whether they were speaking apparently on-topic during their allotted public comment period.

248. Wilson also ordered the removal of two individuals who were speaking out-of-turn, either at the same time that another speaker was at the podium or twice during the same agenda item's public comment period.

249. Wilson did not order the removal of speakers who were not clearly on-topic at the May 10, 2017, Metro Council meeting, when they did not mention Alton Sterling, the date of his killing, or the police.

250. At a later meeting, on June 28, 2017, Wilson again removed a community member who mentioned the killing of Alton Sterling. Community member Arthur Reed was removed when, in a public comment on an agenda item authorizing settlement for an auto accident, he said, "on this item we would like to know when you're going to stop pussyfooting around and handle this Alton Sterling situation." (Pl. Ex. 22 at 00:28–00:35.)

251. Defendant argues that this removal was because Reed was off-topic and used the word "pussyfooting." (Doc. 196 at 36.) The word "pussyfoot" dates back to at least the early 1900s and means "to tread or move warily or stealthily," or "to refrain from committing oneself," according to the Merriam-Webster Dictionary. *Pussyfoot*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/pussyfoot (last visited September 9, 2025).

It is in widespread use in popular publications and media. *Id.* It is unclear why its use by Reed would prompt removal from a Metro Council meeting. The Court cannot lend credence to such a reason.

252.   Reed was removed without any warnings and, like Plaintiffs, without any opportunity to explain how he believed his comments were connected to the agenda item at hand.

253.   On the other hand, three years before the May 10, 2017, Metro Council meeting, community member Jim Mora was allowed to read for two minutes uninterrupted from the Dr. Seuss book "Oh, The Places You'll Go!" without being interrupted, warned, or removed from the podium or the room. (Pl. Ex. 27 at 46:57–49:04.) The items on the agenda involved extensions to the city limits for the City of Baton Rouge. (*Id.* at 00:01–01:02.)

254.   As Defendants point out, though, this was approximately three years earlier and involved a different Mayor Pro Tempore. (Doc. 196 at 39.)

255.   In the months after the May 10, 2017, Metro Council meeting, however, the same pattern continued.

256.   At a Metro Council meeting on June 14, 2017, community members Janice Weber and Dan Weber spoke during public comment on Item 66, which involved a Cooperative Endeavor Agreement with the East Baton Rouge Parish Council on Ageing, Inc., and the parish. (Pl. Ex. 24 at 00:01–00:16, 01:58–03:08, 03:19–04:25.) Janice Weber spoke not about the Cooperative Endeavor Agreement but instead about a millage, which was the next item on the agenda. (*Id.* at 01:58–02:27.) Wilson interrupted her to clarify that the millage was the next agenda item, but he allowed Janice Weber to stay at the podium, where she asked a question about the Cooperative Endeavor Agreement before returning to her seat of her own volition. (*Id.* at 02:27–03:08.)

257.    Ms. Weber was given the opportunity to speak for multiple sentences before she was interrupted by Wilson and told that she was off-topic. Wilson did not threaten her with removal or demand that she connect her comments to the agenda item. When, after Wilson informed Ms. Weber that she was off-topic, Ms. Weber asked a question more related to the agenda item at hand, after which she was allowed to sit without being removed. She was not repeatedly interrupted, nor removed the moment Wilson believed her to be off-topic. Instead, Ms. Weber was given the opportunity to make on-topic remarks.

258.    Likewise, at the same Metro Council meeting, Dan Weber spoke during public comment on the same agenda item and likewise discussed the millage rather than the CEA. (*Id.* at 03:19–04:17.) He spoke for approximately a minute before being interrupted by Wilson, who reminded him of the agenda item at hand and told Mr. Weber that he could return for the next agenda item to discuss the concerns he was raising. (*Id.* at 03:18–04:25.) Mr. Weber was not threatened with removal nor forcibly removed from the podium or the room. Mr. Weber had the opportunity, over the course of that minute, to explain how his comments were related to the agenda item at hand. After being interrupted by Wilson, he could have spoken on the agenda item at hand or connected his previous comments to the agenda item at hand, again without the threat of removal.

259.    Approximately two months later, at a Metro Council meeting on August 23, 2017, Wilson again allowed community members the time to explain how they perceived their comments that began off-topic or on topics only tangentially related to the agenda items to be related to the agenda items—without removing them from the podium or the meeting. (*See* Pl. Ex. 25, 26.)

260.    First, community member Russell Kelly spoke during public comment on Item 101, (Pl. Ex. 26 at 7:24–8:14), which expressed the Metro Council's support for the Louisiana Department of Justice's investigation into the shooting of Alton Sterling "to be conducted and concluded as expeditiously as possible." (*Id.* at 00:01–00:12.)

261.    Kelly did not discuss the Louisiana Department of Justice investigation. (*Id.* at 7:24–8:14.) Instead, he asked whether the council had any "team training to help y'all understand and work with each other" on "these types of matters[]" then continued to talk about team training. (*Id.* at 7:33–7:50.) After Kelly said, "let me tell y'all about team training," Wilson interrupted to say that the item at hand was about the attorney general. However, Wilson then allowed Kelly to continue to speak about team training for several more sentences after Kelly said "well, I'm sure the attorney general trains his team, so as far as tying it together." (*Id.* at 7:48–8:14.)

262.    At the same meeting, community member Don Ortega participated in public comment on agenda Item 139, which addressed a proposal to move the Baton Rouge Zoo. (Pl. Ex. 25 at 00:01–3:47.) Ortega's comments were largely not related to the proposal to move the zoo but instead focused on his own disputes with BREC management as a former employee. (*Id.* at 01:02–3:49.) After nearly a minute, Wilson interrupted with a point of order noting that the agenda item was about the zoo. (*Id.* at 1:52–2:02.) Ortega acknowledged the interruption and continued. (*Id.* at 2:02–2:12.) Wilson again interrupted to say, "we need to talk about the item of the zoo" and warned Ortega that if he did not talk about the zoo, he would be asked to leave. (*Id.* at 2:12–2:19.) Ortega acknowledged the interruption again and said, "I am talking about the zoo." (*Id.* at 2:14–2:17.) Wilson said this was Ortega's last warning. (*Id.* at 2:20–2:22.)

263.  Ortega then said, "the issue here is, the zoo—they've already decided what they want to do with the zoo." (*Id.* at 2:22–2:29.) He then returned to his concern that BREC failed to listen to input from citizens, the Council, and others, particularly with respect to costs. (*Id.* at 2:29–2:57.) Ortega included a couple of sentences about how a park could, potentially, be built at a lower cost and—on topic to the agenda item—the zoo could, potentially, be moved in less time. (*Id.* at 2:57–3:26.) However, the majority of his comments were on the concern that BREC did not take input from others and that their failure to listen to others would cost them. (*Id.* at 3:26–3:48.)

264.  Ortega's comments were clearly viewed as off-topic, and he was repeatedly warned that they must be on-topic. (*Id.* at 1:52–2:22.) Ortega was then given the opportunity to show how his comments were connected to the zoo, and despite going off-topic again for approximately another thirty seconds after being warned twice that he must stay on-topic, he was permitted to stay at the podium and continue speaking. (*Id.* at 2:29–2:57.) He was not given another warning, nor was he removed from the podium, nor was he removed from the room. Instead, he was given the opportunity to connect his remarks to the topic of the zoo and explain how he saw them as on-topic.

265.  In a Metro Council meeting on September 27, 2017, Wilson again allowed community members to speak on topics that were not clearly related to the agenda items without removing them, giving them the opportunity to explain how they saw their comments as being on-topic. (*See* Pl. Ex. 23.)

266.  Community member Phillip Lillard spoke on Item 76, which changed the allotments of the Office of Community Development. (*Id.* at 00:01–00:22.) Lillard referred to his comments on an earlier agenda item, saying, "I didn't get to finish before," and urged the Metro

Council to reconsider the previous item. (*Id.* at 00:31–1:09.) He was allowed to continue for several sentences before Wilson interrupted him to tell him that they were currently discussing Item 76, not Item 78. (*Id.* at 1:09–1:20.) Lillard said that he had not been able to finish earlier, and that he was "against Item 76 because the other item shouldn't have passed[.]" (*Id.* at 1:15–1:34.) Lillard was able to explain that he saw the Metro Council's actions in passing Items 76 and 78 as connected, and he opposed Item 76 because he did not believe the Metro Council should have passed Item 78—very similar to Plaintiffs' opposition to the Metro Council moving forward with other business without addressing Alton Sterling's killing.

267.   Lillard continued to speak about Item 78 and the contract that had been approved in Item 78 for over thirty seconds before he was again interrupted. (*Id.* at 1:34–2:12.) Wilson warned Lillard to stay on topic or sit down, at which point Lillard again reiterated that he would like for the counsel to reconsider, then sat of his own volition. (*Id.* at 2:12–2:22.) Lillard was not ordered removed from the podium or the room, despite his last comments.

268.   At the same meeting and on the same agenda item, Chambers approached the podium during public comment. (*Id.* at 3:42–45.) He stated that he wanted to "express my distaste for how we continue to give all of the resources to the same people, and then we complain about the state of affairs[.]" (*Id.* at 3:51–4:00.) Chambers preemptively stated "it's relevant, Scott," at which point Wilson interrupted and said "it may be, but this is about the jobs[,]" encouraging Chambers to stay on-topic. (*Id.* at 4:05–4:13.)

269.   Chambers argued that the way that the Council allocated money had an impact on the quality of life in Baton Rouge, including on the murder rate. (*Id.* at 4:14–4:50.) Wilson interrupted to say that this was not relevant to the agenda item at hand. (*Id.* at 4:52–4:53.)

Chambers reiterated that the allocation of money was relevant, (*id.* at 4:54–5:02), and Wilson interrupted to tell him to speak on the agenda topic or sit down, (*id.* at 5:02–5:08). After Chambers continued to speak about the allocation of funds, Wilson told him to sit down. (*Id.* at 5:08–5:20.) At no point was Chambers removed from the podium or the room. He was instead given multiple opportunities to explain how he saw his comments as relevant.

270.    On the other hand, at the August 23, 2017, Metro Council meeting, Chambers participated in public comment on Item 101, which expressed the Metro Council's support for the Louisiana Department of Justice's investigation into the shooting of Alton Sterling to be conducted and concluded expeditiously. (Pl. Ex. 26 at 4:11–7:13; *see id.* at 00:01–00:12.) Chambers asked the Metro Council to put a timeline on the investigation, noting that it had already gone on for some time. (*Id.* at 4:30–5:33.) As soon as he brought up Blane Salamoni, still on the topic of the death of Alton Sterling and the item at hand, he was interrupted, told he had ten seconds, and informed that needed to wrap up his comments. (*Id.* at 6:54–7:04.)

271.    According to Defendant, this interaction shows that Chambers was allowed to speak about Alton Sterling and the officers involved in his killing when it was directly on topic. (Doc. 196 at ¶¶ 208–09.)

272.    Be that as it may, there is no record evidence of any community member being removed from a Metro Council meeting for "being off-topic" *except* those who spoke about Alton Sterling and the police.[7]

---

[7] The Court acknowledges that community members were removed for speaking from places other than podium or for speaking twice on the same agenda topic. However, the Court cannot find these removals to be the same as the removals of community members during their time for public comment, within moments of bringing up the killing of

273.   Wilson's forcible removal of all those community members who brought up Alton Sterling's killing and the police stands in contrast to his treatment of community members whose comments, although not immediately clearly relevant to the agenda items at hand, did not touch on Alton Sterling's killing or the police involved.

274.   The Court, then, finds that Plaintiffs McClanahan and Collins have carried their burden with respect to their First Amendment claim for their removal from the podium.

### 3.   Have Plaintiffs shown by a preponderance of the evidence that their removal from the Metro Council meeting room violated a separate First Amendment right to remain in the chamber?

275.   Plaintiffs also claim that they had an independent First Amendment right to remain in the chamber, separate from their right to speak. (Doc. 198-1 at ¶¶ 129, 131.)

276.   The Supreme Court permits "restrictions on access to a limited public forum, . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral[.]" *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 (2010).

277.   Wilson ordered Dunnam to "take [McClanahan] out[]" as soon as McClanahan spoke about Alton Sterling's killing. (Def. Ex. 2 at 01:14–01:22.)

278.   Wilson ordered Dunnam to take [Collins] out[]" as soon as Collins began to say the date of Alton Sterling's killing. (Def. Ex. 5 at 4:27–31.)

279.   As the Court previously found, these removals were not reasonable and viewpoint neutral.

---

Alton Sterling and the officers involved, without any opportunity to explain how their comments were connected to the agenda item at hand. Likewise, as the Court has already found, Chambers was removed for willful disruption. His lack of any attempt to tie his comments to the agenda item at hand was one factor in the reasonableness of this removal. However, although Wilson interrupted Chambers before he mentioned the police or Alton Sterling, Wilson did not order Chambers removed from the podium until Chambers brought up the police. (Def. Ex. 3 at 00:25–00:30.)

280. Plaintiffs McClanahan and Collins' removal from the Metro Council chamber was therefore a separate violation of their First Amendment rights.

281. Plaintiff Chambers' removal from the podium was not, as the Court has previously found, a violation of his First Amendment right. Once he was ordered removed, he physically resisted his removal and repeatedly called Wilson a coward, further disrupting the orderly conduct of the meeting. (Def. Ex. 3 at 00:37–01:15.)

282. Plaintiff Chambers was arrested not on Wilson's orders but as a result of the independent decision of Dunnam. (Doc. 194 at 154.) Plaintiff Chambers has not shown an independent violation of his constitutional rights.

   **4.    Have Plaintiffs shown by a preponderance of the evidence that Collins' removal from the podium constituted a violation of the doctrine of prior restraint?**

283. The Court now turns to the question of prior restraint with respect to Plaintiff Collins.

284. "Prior restraints—defined as 'predetermined judicial prohibition[s] restraining specific expression'—. . . receive a 'presumption against their constitutionality.'" *In re Goode*, 821 F.3d 553, 559 (5th Cir. 2016) (citing *United States v. Brown*, 218 F.3d 415, 424–25 (5th Cir. 2000) (quoting *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467 (5th Cir. 1980)).

285. The Fifth Circuit has stated that "[g]enerally, a prior restraint is constitutional only if the Government 'can establish that "the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest."'" *Id.* (quoting *Brown*, 218 F.3d at 425 (quoting *Levine v. U.S. Dist. Court for Cent. Dist. of Cal.*, 764 F.2d 590, 595 (9th Cir. 1985))).

286.     "The Government must also demonstrate that the prior restraint is narrowly tailored and provides the least restrictive means to achieve the Government's goal." *Id.* (citing *Brown*, 218 F.3d at 425).

287.     Examples of prior restraints include "ordinances regulating speech contingent on the will of an official—such as the requirement of a license or permit that may be withheld or granted in the discretion of an official[,]" *Chiu*, 339 F.3d at 280, and "[c]ourt orders aimed at preventing or forbidding speech[,]" *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)).

288.     Plaintiffs' argument here relies on the premise that Wilson ordered Collins removed before Collins had the opportunity to speak. (Doc. 110 at 2; Doc. 198-1 at ¶ 186.)

289.     However, Wilson ordered Collins' removal after Collins said, "I oppose this motion because on July . . ." (Def. Ex. 5 at 4:27–4:36.)

290.     The Court cannot, therefore, find that this was a violation of the doctrine of prior restraint. Instead, as the Court previously found, Wilson's order was in response to the contents of Collins' speech.

## 5.     Have Plaintiffs shown that Wilson engaged in racial discrimination in violation of their Fourteenth Amendment rights?

291.     Finally, the Court turns to the question of whether Wilson engaged in racial discrimination against Plaintiffs.

292.     "To make out an equal protection violation, a party cannot merely prove disparate impact— he must 'prove "the existence of purposeful discrimination" motivating the state action which caused the complained-of injury.'" *Allen v. Hays*, 65 F.4th 736, 748 (5th Cir. 2023)

(quoting *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292–93 (1987)).

293.    "Specifically, '[d]iscriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group.'" *Id.* (quoting *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (internal quotations omitted).

294.    As the Court previously noted, Wilson ordered the removal not only of Plaintiffs but also of Ms. Weaver, Ms. Espinoza, and Ms. Epps after they each spoke about the killing of Alton Sterling and the police. (Def. Ex. 5 at 03:01–03:08.)

295.    Plaintiffs identify Ms. Weaver and Ms. Espinoza as White and Ms. Epps as Black. (Doc. 198-1 at ¶ 199.) They argue that Ms. Weaver was allowed "to speak significantly longer than the others[]" and that "Wilson only ordered Ms. Weaver removed *after she pointed out the racial disparity*." (*Id.*)

296.    Dunnam testified that the only reason Ms. Weaver was not removed earlier was because there were no officers available in the room to do so. (Doc. 194 at 168–70.)

297.    More importantly, Wilson ordered that Ms. Espinoza, who is not Black, be removed as soon as she mentioned "the officers involved[.]" (Def. Ex. 5 at 04:44–05:25.)

298.    Plaintiffs have not shown disparate impact, much less discriminatory intent.

## VI.    CONCLUSION

299.    In conclusion and for the reasons stated above, the Court will grant judgment in favor of Plaintiffs Michael McClanahan and Eugene Collins and against Defendant Scott Wilson in his official capacity as Mayor Pro Tempore, on their claims for violations of their First Amendment rights. However, the Court will grant judgment in favor of Defendant Wilson

and against Plaintiff Chambers on Chambers' claims for violations of his First Amendment rights under 42 U.S.C. § 1983.

300. The Court will grant judgment in favor of Defendant and against Plaintiffs on Plaintiffs' claim for racial discrimination in violation of the Fourteenth Amendment.

301. The Court therefore orders a declaratory judgment be issued in favor of Plaintiffs McClanahan and Chambers on their First Amendment claims.

302. "Section 1988 provides in relevant part: 'In any action or proceeding to enforce a provision of [§ 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.'" *Walker v. City of Mesquite*, 313 F.3d 246, 249 (5th Cir. 2002) (quoting 42 U.S.C. § 1988).

303. Where Plaintiffs "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit[,]" they "may be considered 'prevailing parties[.]'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (internal citation omitted); *see also Boone v. Rankin Cnty. Pub. Sch. Dist.*, 140 F.4th 697, 713 (5th Cir. 2025).

304. Plaintiffs Collins and McClanahan have succeeded on their First Amendment claims and may therefore be considered prevailing parties. They should submit a bill of costs and an application for attorney's fees, with the appropriate documentation, in accordance with Local Rule 54. *See* M.D. La. Civ. R. 54(a), (b).

Signed in Baton Rouge, Louisiana, on September 22, 2025.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

55